LANDIN v HEALTHSOURCE SAGINAW, INC

Docket No. 309258. Submitted February 4, 2014, at Detroit. Decided
June 3, 2014, at 9:05 a.m. Leave to appeal sought.

Roberto Landin, a licensed practical nurse, brought an action in the
Saginaw Circuit Court against his former employer, Healthsource
Saginaw, Inc., alleging wrongful discharge from employment in
violation of public policy. Plaintiff claimed that his employment
was terminated because he reported negligence by a coworker to a
supervisor. He alleged that the coworker's negligence had directly
led to the death of a patient. The court, Janet M. Boes, J., denied
defendant's motions for summary disposition, holding that Michi-
gan law recognizes a cause of action for wrongful termination in
violation of the public policy exhibited by MCL 333.20176a(1)(a).
The matter proceeded to trial and the jury reached a verdict in
favor of plaintiff. Defendant appealed the denial of its motions for
summary disposition, a directed verdict, judgment notwithstand-
ing the verdict, a new trial, or remittitur. Defendant also alleged
error with regard to the court's rulings on several discovery and
evidentiary issues.

The Court of Appeals *held*:

1. Michigan law generally presumes that employment relation-
ships are terminable at the will of either party. There is an exception
to the at-will employment doctrine based on the principle that some
grounds for discharging an employee are so contrary to public policy
as to be actionable. The three public policy exceptions that have been
recognized entail an employee's exercising a right guaranteed by law,
executing a duty required by law, or refraining from violating the law.
The three exceptions concern (1) explicit legislative statements
prohibiting the discharge, discipline, or other adverse treatment of
employees who act in accordance with a statutory right or duty, (2)
where the alleged reason for the discharge was the failure or refusal
of the employee to violate a law in the course of employment, and (3)
where the reason for the discharge was the employee's exercise of a
right conferred by a well-established legislative enactment.

2. Courts may only derive public policy from objective sources.

3. The trial court did not err by denying defendant's motions
for summary disposition because the statutory basis for plaintiff's

public policy claim, MCL 333.20176a, could support a public-policy-based wrongful discharge claim.

4. The trial court did not err by denying defendant's motion for summary disposition that alleged that plaintiff's claim fell within the provisions of the Michigan Whistleblowers' Protection Act, MCL 15.362, and was subject to the exclusive remedies provided by that act. Because plaintiff did not allege a violation of the Public Health Code, the provision of the Public Health Code providing protection under the Whistleblowers' Protection Act for certain persons who report a violation of Article 17 of the Public Health Code or a rule promulgated under Article 17 was not applicable.

5. The trial court properly determined that a question of fact existed for the jury regarding whether there was a causal connection between plaintiff's protected activity and the termination of his employment. A question of fact existed regarding the reasons for the termination.

6. The trial court did not abuse its discretion by denying defendant's motion to compel plaintiff to return certain confidential medical records of nonparties. Given the circumstances, the court's grant of a protective order and the redaction of patient names was appropriate.

7. The fact that front pay damages may be speculative should not exonerate a wrongdoer from liability. The trial court did not err by denying defendant's claim that front pay damages should be disallowed as being unduly speculative.

8. The trial court appropriately submitted the issue of mitigation of damages to the jury. The issue was one of fact for the jury to decide.

9. Because a question of fact existed on the issue, the trial court did not err by submitting to the jury the issue whether, regardless of what had transpired before plaintiff's discharge, defendant would have fired plaintiff in any event when it learned that he had removed and copied confidential patient records.

10. The trial court properly held that evidence concerning plaintiff's coworker's actions, testimony from witnesses regarding the deceased patient's medical records, and the argument by plaintiff's counsel regarding whether plaintiff's coworker should have been dismissed was relevant and admissible. Evidence of the coworker's performance history was also relevant.

11. The trial court did not abuse its discretion by excluding certain evidence offered by defendant that allegedly absolved the coworker. The trial court properly determined that the evidence was irrelevant.

12. The trial court did not err by admitting testimony that plaintiff's supervisor allegedly falsified documents.

13. Defendant, by expressing satisfaction with the jury instructions given by the trial court, waived any error resulting from the trial court's denial of defendant's request for an instruction concerning the measure of damages as it related to health insurance.

14. The trial court did not abuse its discretion by denying defendant's motions for judgment notwithstanding the verdict and a new trial. Defendant failed to establish that remittitur was warranted with respect to the award for emotional damages. The trial court did not abuse its discretion by denying defendant's motion for remittitur.

15. The jury's verdict regarding plaintiff's economic loss was not excessive and was supported by the evidence.

16. The jury's verdict was not based on unfair and prejudicial evidence.

Affirmed.

*Hurlburt, Tsiros & Allweil, PC* (by *Mandel I. Allweil*), for plaintiff.

*Miller, Canfield, Paddock and Stone, PLC* (by *Richard W. Warren* and *M. Misbah Shahid*), for defendant.

Before: JANSEN, P.J., and K. F. KELLY and SERVITTO, JJ.

SERVITTO, J. Defendant appeals as of right the trial court's denial of its motions for summary disposition. Defendant also appeals the trial court's rulings on several discovery and evidentiary issues and its denial of defendant's motions for a directed verdict, judgment notwithstanding the verdict, a new trial, or remittitur. We affirm.

Plaintiff is a licensed practical nurse. He began working for defendant, a nonprofit community hospital, in March 2001 as an at-will employee and his employment was terminated in April 2006. Plaintiff asserts that he was terminated because he reported negligence

by a coworker, which negligence he believed directly led to the death of a patient, to a supervisor. Plaintiff alleged that after he reported the believed negligence, he was retaliated against by defendant and the retaliation ultimately culminated in his termination. In his complaint against defendant, plaintiff alleged wrongful discharge in violation of public policy.

Defendant initially moved for summary disposition pursuant to MCR 2.116(C)(8), arguing that plaintiff's public policy claim was preempted by § 2 of the Michigan Whistleblowers' Protection Act, MCL 15.362. The trial court denied the motion. Defendant later moved for summary disposition pursuant to MCR 2.116(C)(10), asserting that plaintiff had identified no public policy on which his claim was grounded and that plaintiff could not and did not identify any law or policy under which his claim could survive. The trial court again denied defendant's motion for summary disposition. The trial court did not initially identify any specific law or public policy that would support plaintiff's cause of action but, in an October 13, 2011, opinion and order, the trial court stated that it was holding, as matter of law, that "Michigan law recognizes a cause of action for wrongful termination in violation of the public policy exhibited by MCL 333.20176a(1)(a) . . . ." Defendant thereafter filed a renewed emergency motion for summary disposition based primarily on its assertion that the statute cited by the trial court provided no basis for plaintiff's public policy claim. The trial court again denied the motion and the matter proceeded to trial, at the conclusion of which the jury reached a verdict in favor of plaintiff.

Defendant first argues on appeal that the trial court committed error requiring reversal by failing to apply the proper analysis and law to defendant's second and

third motions for summary disposition and thereafter committed error requiring reversal by denying defendant's motions. We disagree.

This Court reviews de novo a trial court's decision to grant or deny a motion for summary disposition. *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 202; 731 NW2d 41 (2007). A motion under "MCR 2.116(C)(8) tests the legal sufficiency of the claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted." *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). Summary disposition under subrule (C)(8) is appropriate "if no factual development could justify the plaintiff's claim for relief." *Id*. A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). In evaluating a motion for summary disposition brought under (C)(10), a reviewing court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996); MCR 2.116(G)(5). If the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. *Quinto*, 451 Mich at 362-363.

Michigan law generally presumes that employment relationships are terminable at the will of either party. *Lytle v Malady (On Rehearing)*, 458 Mich 153, 163; 579 NW2d 906 (1998). There is, however, an exception to the at-will employment doctrine "based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 695; 316 NW2d 710 (1982).

In *Suchodolski*, the plaintiff began working for Michigan Consolidated Gas Company in September 1972 as a senior auditor and was discharged in January 1976. He sued his former employer in 1978, stating various theories of recovery in a six-count complaint. Relevant to the instant action, the plaintiff alleged that during his employment he discovered and reported poor internal management of the defendant corporation, that he was fired for attempting to report and correct questionable management procedures, and that his firing was retaliatory and against the public policy of Michigan. *Id.* at 693-694. The trial court granted summary disposition in favor of the defendant with regard to all six of the counts and the Court of Appeals affirmed with regard to five of the counts, including the count relevant to this action. Our Supreme Court, in affirming the Court of Appeals, opined that the only grounds that have been recognized as so violative of public policy that they serve as an exception to the general rule of at-will employment are: (1) explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty (e.g., the Civil Rights Act, MCL 37.2701; the Whistleblowers' Protection Act, MCL 15.362; the Persons With Disabilities Civil Rights Act, MCL 37.1602), (2) where the alleged reason for the discharge was the failure or refusal of the employee to violate a law in the course of employment (e.g., refusal to falsify pollution reports; refusal to give false testimony before a legislative committee; refusal to participate in a price-fixing scheme), and (3) where the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment (e.g., retaliation for filing workers' compensation claims). *Suchodolski*, 412 Mich at 695-696. The Supreme Court determined that

the matter before it involved only a corporate management dispute and that the dispute lacked "the kind of violation of a clearly mandated public policy that would support an action for retaliatory discharge." *Id*. at 696.

"Our Supreme Court's enumeration [in *Suchodolski*] of 'public policies' that might forbid termination of at-will employees was not phrased as if it was an exhaustive list." *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569, 573; 753 NW2d 265 (2008). This does not mean, however, that trial courts have unfettered discretion or authority to determine what may constitute sound public policy exceptions to the at-will employment doctrine. As observed in *Terrien v Zwit*, 467 Mich 56, 66-67; 648 NW2d 602 (2002):

> In defining "public policy," it is clear to us that this term must be more than a different nomenclature for describing the personal preferences of individual judges, for the proper exercise of the judicial power is to determine from objective legal sources what public policy *is*, and not to simply assert what such policy *ought* to be on the basis of the subjective views of individual judges. . . .
>
> In identifying the boundaries of public policy, we believe that the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law. See *Twin City Pipe Line Co v Harding Glass Co*, 283 US 353, 357; 51 S Ct 476; 75 L Ed 1112 (1931). The public policy of Michigan is *not* merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law. There is no other proper means of ascertaining what constitutes our public policy.

Consistent with this observation, the *Terrien* Court noted that as a general rule, making social policy is a job for the Legislature, not the courts, *id*. at 67, and found

instructive the United States Supreme Court's mandate: " 'Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. As the term "public policy" is vague, there must be found definite indications in the law of the sovereign to justify the invalidation of a contract as contrary to that policy.' " *Id.* at 68, quoting *Muschany v United States*, 324 US 49, 66; 65 S Ct 442; 89 L Ed 744 (1945). Thus, courts may only derive public policy from objective sources. *Kimmelman*, 278 Mich App at 573.

Notably, the three public policy exceptions recognized in *Suchodolski* entail an employee's exercising a right guaranteed by law, executing a duty required by law, or refraining from violating the law. *Id.* These three recognized circumstances remain the only three recognized exceptions and the list of exceptions has not been expanded. While the *Suchodolski* Court's enumeration of public policies that might forbid termination of at-will employees may not have been phrased as if it were an exhaustive list (*id.* at 573), our courts have yet to find a situation meriting extension beyond the three circumstances detailed in *Suchodolski*.

Defendant asserts that the trial court erred by failing to apply *Suchodolski*. In denying defendant's motion for summary disposition, the trial court detailed the rule in Michigan concerning at-will employment and also stated that plaintiff's claim against defendant was based on an exception to the rule, as stated in *Suchodolski*. The trial court further explicitly stated the three specific exceptions set forth in *Suchodolski*, indicating its familiarity with and intention to evaluate the claims under such exceptions. The trial court noted that plaintiff relied on MCL 333.17201, MCL 600.2922, and MCL 750.321 as the statutory bases for his claim. Noting an

unfortunate dearth of published binding caselaw on the precise issue "whether a termination of a medical professional's employment violates public policy where the claimant can prove that the firing was in response to an internal complaint relative to concerns about patient safety," the trial court then indicated that it was going to have to make its own "judgment call" and relied on out-of-state cases to conclude: "The life and health of hospital patients depend upon the skill and competency of the professional medical staff—physicians, registered nurses, and licensed practical nurses, like plaintiff Landin and Nurse Johnson. To hold that Landin has no claim against the Defendant, is in essence, to hold that no good deed shall go unpunished. That cannot be the law. The Court therefore denies the motion to dismiss."

The trial court did not, in fact, articulate whether plaintiff's claim fell under any of the specified exceptions of *Suchodolski*, nor did it initially identify any objective source from which to hold that plaintiff had a public policy claim, such as a particular statute (including any of those it cited as relied on by plaintiff). Because courts may only derive public policy from objective sources, *Kimmelman*, 278 Mich App at 573, and controlling law has as yet only identified three groups of public policy exceptions that serve as the basis for wrongful termination claims, the trial court erred by initially failing to apply controlling Michigan law and instead simply looking to cases outside our jurisdiction and to their factual similarity to justify its ruling.[1]

---

[1] The three statutory bases plaintiff cited for his claims, MCL 333.17201, MCL 600.2922, and MCL 750.321, would likely not survive a *Suchodolski* analysis in any event. MCL 333.17201 *et seq.* governs the practice of nursing and who may obtain a nursing license. MCL 600.2922 governs civil wrongful death actions that may be maintained by the deceased's spouse, children, descendants, parents, or other persons to

However, in an opinion issued only one month later, the trial court stated that it was holding, as matter of law, that "Michigan law recognizes a cause of action for wrongful termination in violation of the public policy exhibited by MCL 333.20176a(1)(a)." At that time, then, the trial court set forth an objective basis for plaintiff's public policy claim. While it still did not indicate which of the exceptions cited in *Suchodolski* that plaintiff's claim fell within, plaintiff has not alleged that the reason for his discharge was his failure or refusal to violate a law in the course of employment—exception (2) under *Suchodolski*. Thus, we presume that the trial court found plaintiff's claim "for wrongful termination in violation of the public policy exhibited by MCL 333.20176a(1)(a)" fell within exception (1) or (3).

MCL 333.20176a concerns health facilities and agencies and provides, in part:

> (1) A health facility or agency shall not discharge or discipline, threaten to discharge or discipline, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee or an individual acting on behalf of the employee does either or both of the following:

> (a) In good faith reports or intends to report, verbally or in writing, the malpractice of a health professional or a violation of this article, article 7, article 8, or article 15 or a rule promulgated under this article, article 7, article 8, or article 15.

---

whom the decedent's estate would pass under the laws of intestate succession. MCL 750.321 is the criminal statute defining and describing the punishment for manslaughter. None of these statutes contain any explicit legislative statements concerning a statutory right or duty, let alone a prohibition of the discharge or other adverse treatment of employees who act in accordance with any statutory right or duty, nor do they concern a right conferred by well-established legislative enactment.

In order to serve as a basis for plaintiff's complaint, plaintiff must establish that the above statute meets exception (1) in *Suchodolski*, in that it contains an explicit legislative statement prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty, or exception (3), when the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment. *Suchodolski*, 412 Mich at 695-696. As to exception (1), MCL 333.20176a contains an explicit legislative statement prohibiting discharge or discipline of an employee for specified conduct. It could also be argued that the specified conduct was that of acting in accordance with a statutory right or duty.

Exception (1) has been found to apply to the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*. *Suchodolski*, 412 Mich at 695 n 2. The WPA was enacted to encourage employees to assist law enforcement and to protect those who engaged in "whistleblowing" activities. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378-379; 563 NW2d 23 (1997). "Whistleblowing" activities include reporting (or being about to report) an employer's violations of law, regulation, or rule to a public body and participation in an investigation held by a public body or in a court action. *Henry v Detroit*, 234 Mich App 405, 409; 594 NW2d 107 (1999).

Exception (1) has also been found to apply to the Michigan Civil Rights Act, MCL 37.2101 *et seq*. *Suchodolski*, 412 Mich at 695 n 2. The Civil Rights Act (CRA) was enacted for the purpose of promoting and protecting a specified public policy: it is "aimed at 'the prejudices and biases' borne against persons because of their membership in a certain class, and seeks to eliminate

the effects of offensive or demeaning stereotypes, prejudices, and biases." *Miller v CA Muer Corp*, 420 Mich 355, 363; 362 NW2d 650 (1984) (citations omitted). The CRA states that the opportunity to obtain employment, housing, and the full and equal use of public accommodations, among other things, are "declared to be a civil right." MCL 37.2102(1).

It is well established that the purpose of the statutes regulating health care professionals, including those set forth in the Public Health Code (under which MCL 333.20176a falls), is to safeguard the public health and protect the public from incompetence, deception, and fraud. *Mich Ass'n of Psychotherapy Clinics v Blue Cross & Blue Shield of Mich (After Remand)*, 118 Mich App 505, 522; 325 NW2d 471 (1982). In enacting MCL 333.20176a, the Legislature clearly expressed a desire to further that policy by prohibiting retaliation against an employee who reports malpractice. And the right to report alleged acts of negligence (malpractice) is consistent with and implicit in the purposes of the Public Health Code and its statutory regulations governing health care professionals.

For the same reason, exception (3) in *Suchodolski*, 412 Mich at 695-696 (where the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment) could also apply to MCL 333.20176a. We recognize that the only situation to which (3) has been applied thus far is the termination of an employee in retaliation for filing a workers' compensation claim. In describing this exception, however, *Suchodolski* cited *Sventko v Kroger Co*, 69 Mich App 644; 245 NW2d 151 (1976), wherein a panel of this Court noted that the purpose of the Worker's Disability Compensation Act, as set forth in its title, was " 'to promote the welfare of the people of

Michigan relating to the liability of employers for injuries or death sustained by their employees. The legislative policy is to provide financial and medical benefits to the victims of work-connected injuries in an efficient, dignified, and certain form.' " *Id.* at 647-648, quoting *Whetro v Awkerman,* 383 Mich 235, 242; 174 NW2d 783 (1970). The *Sventko* Court held that "[d]iscouraging the fulfillment of this legislative policy by use of the most powerful weapon at the disposal of the employer, termination of employment, is obviously against the public policy of our state." *Sventko,* 69 Mich App at 648.

The workers' compensation statutes and MCL 333.20176a share the same underlying purpose—to promote the welfare of the people of Michigan as it concerns health and safety. While the workers' compensation statutes were admittedly enacted specifically in the context of protecting employees who are injured in the workplace, it could be argued that reporting malpractice in the context of a medical workplace would have even more of a direct impact on the health and welfare of our citizens and that the right to report alleged malpractice in one's workplace without fear of repercussion is of at least equal, if not of greater, significance than benefitting and protecting victims of work-related injuries. Those employed in the health and medical fields would be best situated to report alleged acts of malpractice to the benefit of the public as a whole. And, if employers in those fields are permitted to terminate employees who report the malpractice of coworkers or others, they, like employers in workers' compensation cases, would be given free rein to use the most powerful tool at their disposal to attempt to deflect their potential liability, but to the detriment of the public and in direct violation of the purpose of the Public Health Code and regulatory statutes governing

the medical profession. Thus, because the statutory basis for plaintiff's public policy claim could support a public-policy-based wrongful discharge claim, the trial court did not err by denying defendant's motions for summary disposition.

Defendant further contends that plaintiff's claim falls squarely within the WPA and that it was thus plaintiff's exclusive remedy so that summary disposition was appropriate in defendant's favor. We disagree.

The Public Health Code provides, at MCL 333.20180(1):

> A person employed by or under contract to a health facility or agency or any other person acting in good faith who makes a report or complaint including, but not limited to, a report or complaint of a violation of this article or a rule promulgated under this article; who assists in originating, investigating, or preparing a report or complaint; or who assists the department in carrying out its duties under this article is immune from civil or criminal liability that might otherwise be incurred and is protected under the whistleblowers' protection act, 1980 PA 469, MCL 15.361 to 15.369. A person described in this subsection who makes or assists in making a report or complaint, or who assists the department as described in this subsection, is presumed to have acted in good faith. The immunity from civil or criminal liability granted under this subsection extends only to acts done pursuant to this article.

If plaintiff was simply reporting a violation of an article or rule under the Public Health Code, defendant's argument would succeed, given that the remedies provided by the WPA are exclusive and not cumulative. *Shuttleworth v Riverside Osteopathic Hosp*, 191 Mich App 25, 27; 477 NW2d 453 (1991). However, plaintiff did not originate a report or complaint alleging a violation of the Public Health Code, he accused a coworker of malpractice. To establish a cause of action for medical malpractice "a plaintiff must establish four

elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). There is no requirement that in order to establish a claim of malpractice, one must necessarily allege a violation of the Public Health Code. The trial court did not err by denying defendant's motion for summary disposition based on the WPA.

Defendant next asserts that the trial court erred when it concluded that a genuine issue of material fact existed regarding the reasons for plaintiff's termination. We disagree.

To establish a prima facie case of unlawful retaliation plaintiff must show (1) that he engaged in a protected activity, (2) that this was known by defendant, (3) that defendant took an employment action adverse to plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. See, e.g., *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 436; 566 NW2d 661 (1997). For purposes of this argument, only Element (4) is at issue.

Defendant presented evidence that its policy for medication administration was for the nurse to watch the patient swallow the medication and then initial that the medication was given. Defendant also presented evidence concerning its discipline policies, including that termination could be a possible method of discipline for even a first offense of falsifying documents. Evidence was also presented that plaintiff admitted that he had violated the medication policy on two occasions, by signing his initials indicating that he had

administered medications when he had not, in fact, watched the patient swallow the medications, before the third incident that led to his termination.

Plaintiff presented evidence that he had regularly violated the medication policy without consequences while in another department in defendant's employ. Plaintiff presented further evidence that the coworker about whom he had filed a report was the individual who initiated the complaints regarding his failure to comply with the medication policy and had initiated the complaints only after she was aware of his accusations against her. Plaintiff presented evidence that the complaints were made within a short time after plaintiff filed his report, that the coworker had never filed a complaint against another employee, that defendant called him to the human resources department when it was discovered that he was speaking to the deceased patient's widow and questioned plaintiff about whether the widow was considering legal action against defendant, and that the coworker had violated defendant's policies on several occasions, which could also subject her to termination under defendant's discipline policy, yet she was not fired.

On the basis of the above evidence, the trial court properly determined that a question of fact existed for the jury regarding whether there was a causal connection between the protected activity and the adverse employment action.

Defendant next argues that the trial court erred by denying its motion to compel plaintiff to return confidential medical records of nonparties that he either stole or inadvertently received without patient authorization. We disagree.

This Court reviews a trial court's decision to grant or deny discovery for an abuse of discretion. *Shinkle v*

*Shinkle (On Rehearing)*, 255 Mich App 221, 224; 663 NW2d 481 (2003). The issue of privilege has a bearing on whether materials are discoverable, MCR 2.302(B)(1) ("[p]arties may obtain discovery regarding any matter [that is] not privileged"). The interpretation and application of the physician-patient privilege is a legal question that is reviewed de novo by this Court. *Meier v Awaad*, 299 Mich App 655, 663; 832 NW2d 251 (2013). Once we determine whether the privilege is applicable to the facts of this case, we can determine whether the trial court's order was an abuse of discretion. *Baker v Oakwood Hosp Corp*, 239 Mich App 461, 468; 608 NW2d 823 (2000). See *Dorris v Detroit Osteopathic Hosp Corp*, 220 Mich App 248, 250; 559 NW2d 76 (1996), aff'd 460 Mich 26 (1999).

As thoroughly explained in *Meier*, 299 Mich App at 666:

> The scope of the physician-patient privilege is governed entirely by the statutory language, as the privilege was not recognized under the common law. *Dorris*, 460 Mich [26, 33; 594 NW2d 455 (1999)]. "It is well established that the purpose of the statute is to protect the confidential nature of the physician-patient relationship and to encourage a patient to make a full disclosure of symptoms and condition." *Id*. Because the privilege of confidentiality belongs solely to the patient, it can only be waived by the patient. *Id*. at 34, citing *Gaertner v Michigan*, 385 Mich 49, 53; 187 NW2d 429 (1971). "A patient may intentionally and voluntarily waive the privilege." *Dorris*, 460 Mich at 39. As reflected in the express language of MCR 2.302(B)(1), which governs the scope of discovery, the protection of privileged information supersedes even the liberal discovery principles that exist in Michigan. *Id*. at 37.

The physician-patient privilege statute provides, in pertinent part:

> Except as otherwise provided by law, a person duly authorized to practice medicine or surgery shall not disclose any

information that the person has acquired in attending a patient in a professional character, if the information was necessary to enable the person to prescribe for the patient as a physician, or to do any act for the patient as a surgeon. [MCL 600.2157.]

The physician-patient privilege is an absolute bar that prohibits the unauthorized disclosure of patient medical records, including when the patients are not parties to the action. *Baker*, 239 Mich App at 463.

In this matter, plaintiff admitted copying the deceased patient's medical records and removing them from the hospital. In its motion to compel the return of confidential, nonparty documents, defendant sought the return of those documents as well as documents that defendant had "inadvertently" produced in response to plaintiff's discovery requests. Clearly, then, defendant's employees, other than plaintiff, took and copied patient records as well. Defendant then used the records during depositions and in its defense to try to establish that the accused coworker complied with protocol and that plaintiff was fired for a valid reason (by showing that he did not give medications per defendant's policy or falsified medication documents).

This is not a case similar to those cited by defendant wherein a party sought to compel the production of privileged information and was refused. Instead, this is a case wherein defendant sought to unring a bell. The materials were already disclosed and used by both parties, for better or worse. As indicated by the trial court, defendant was aware of plaintiff's possession of the records for well over a year before contending that they were protected by privilege and seeking their return. In addition, plaintiff and defendant placed the reason for plaintiff's termination at issue. The reason for his termination would be proved only by reference to

patient records showing whether plaintiff did, in fact, sign his initials indicating that he gave medications when he did not and the patients' complaints (or lack thereof) about receiving medications from plaintiff. Given those circumstances, the trial court's denial of defendant's motion for the return of confidential records and, instead, the grant of a protective order and the redaction of patient names was appropriate. The trial court did not abuse its discretion by denying defendant's motion to return confidential records.

Next, defendant raises several issues concerning the trial court's rulings on plaintiff's damages. Defendant first asserts that whether front pay was available and, if so, the amount recoverable were issues for the trial court to determine as a matter of law, not the jury. We disagree.

"Front pay" is defined as "a monetary award that compensates victims of discrimination for lost employment extending beyond the date of the remedial order." *Rasheed v Chrysler Corp*, 445 Mich 109, 117 n 8; 517 NW2d 19 (1994) (quotation marks and citation omitted). By extension, such pay would compensate victims of unlawful termination for lost employment extending beyond the date of a remedial order. Defendant primarily cites *Riethmiller v Blue Cross & Blue Shield of Mich*, 151 Mich App 188; 390 NW2d 227 (1986), in support of the proposition that front pay issues are not submissible to the jury and, we presume, our Supreme Court's statement in that case that "the trial court should have discretion in deciding, based on circumstances of each case, whether to award future damages." *Id.* at 201. This is not, however, a proclamation that whether front pay is to be awarded is an issue of law for the trial court to decide. The *Riethmiller* Court was reviewing decisions made by the trial court *in a*

*bench trial* and the issue whether such damages were awardable *at all,* as opposed to a defendant's remedy being limited simply to reinstatement.

Even if the determination whether future damages should be awarded is an issue for the trial court to decide, the trial court in this matter implicitly found such damages to be available. The trial court allowed plaintiff's expert to testify regarding plaintiff's lost wages as a result of his termination. And the allowance of an award of front pay damages is, according to *Riethmiller,* within the discretion of the trial court. Defendant has not claimed that the trial court abused its discretion.

Defendant further claims that the trial court should have disallowed front pay damages as being unduly speculative. The *Riethmiller* Court, however, unequivocally stated with reference to front pay that "[t]he fact that such damages may be speculative should not exonerate a wrongdoer from liability." *Id.* at 201. Thus, this argument fails.

Next, defendant contends that, because plaintiff had a duty to mitigate his damages, the trial court should have limited plaintiff's damages for front pay to the period up to when he quit the first job he obtained after being terminated by defendant (March 2008) or when he was fired from the next job he obtained (July 2008). We disagree.

Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from wrongdoing. *Morris v Clawson Tank Co,* 459 Mich 256, 263; 587 NW2d 253 (1998). Specifically, when one has committed a legal wrong against another, the latter has an obligation to use reasonable means under the circumstances to avoid or minimize his or her damages and cannot recover for damages that could thus have been avoided.

*Id.* In the case of a wrongful discharge, the victim of the wrongdoing must make reasonable efforts to find employment after the discharge.

The defendant bears the burden of proving that the plaintiff failed to make reasonable efforts to mitigate damages. *Id.* The question whether the plaintiff's efforts to mitigate damages were reasonable under the circumstances is one for the trier of fact. *Id.* at 270-271. As stated in *Morris*, 459 Mich at 271:

> Determining the "reasonableness" of a job search is a fact-laden inquiry requiring thorough evaluation of, for example, the earnestness of a plaintiff's motivation to find work and the circumstances and conditions surrounding his job search, as well as the results of it. The extent to which a plaintiff continues his job search once he has found employment is simply one of many factors in this fact-laden determination of reasonableness. Much of this inquiry depends upon determinations of credibility, which are far more within the competence of the trial court than within the competence of appellate judges reading dry records.

"The plaintiff's back-pay award, if he succeeds at trial, is then reduced by the amount that he earned in mitigation." *Id.* at 264. Thus, contrary to defendant's assertion otherwise, the trial court appropriately submitted the issue of mitigation of damages to the jury. As clearly held in *Morris*, the issue was one of fact for the jury to decide.

Finally, defendant asserts that the trial court should have determined whether, regardless of what had transpired before plaintiff's firing, defendant would have fired plaintiff in any event when it learned that he had removed and copied confidential patient records (the after-acquired-evidence doctrine). Defendant asserts that this issue is to be determined as a matter of law and should not be submitted to the jury for resolution. Again, we disagree.

In *Wright v Restaurant Concept Mgt, Inc*, 210 Mich App 105; 532 NW2d 889 (1995), a panel of this Court held that where after-acquired evidence of misconduct by the employee was presented as well as evidence that the employer would have terminated the employee had it known of the misconduct, the employee was still not barred from all relief as a matter of law in his claim of wrongful discharge against his employer, but that any wrongdoing on his part could be reflected in the nature of the relief awarded to him. *Id.* at 112. It concluded that this approach "precludes the exoneration of either wrongdoer while preserving the statutory goal of deterring discrimination." *Id.* at 113. The *Wright* Court further held that the effect of after-acquired evidence of employee misconduct on an action would vary with the facts but that, generally, neither reinstatement nor front pay would be an appropriate remedy; however, a good starting point for determining back pay was to calculate back pay from the date of the unlawful discharge to the date that the employee's misconduct was discovered. *Id.* at 113 n 1.

*Horn v Dep't of Corrections*, 216 Mich App 58, 68; 548 NW2d 660 (1996), followed *Wright* and noted that in the factual situation before it, "the trial court appropriately determined that no genuine factual issues remained regarding whether defendant would have dismissed plaintiff for [the misconduct disclosed in the after-acquired evidence]." Thus, it can be concluded from *Horn* that the preliminary issue concerning whether the defendant would have terminated the plaintiff on the basis of the after-acquired evidence is a factual question. If the trial court found that no factual issue existed, the trial court could make the determination whether the employer would have dismissed the employee on the basis of the after-acquired evidence, if the trial court found that fac-

tual issues existed on the issue, the trial court would properly submit the issue to the jury.

In this matter, defendant stated that it would have terminated plaintiff had it known that he had copied and removed the deceased patient's (and, apparently a few other patients') medical records. However, aside from defendant's self-serving statement, there is no evidence that it would have done so. The fact that there was a policy in place prohibiting such conduct is of no consequence, given the evidence concerning other policies in place, employee's violations of the same, and defendant's failure to terminate other employees for violating its policies. Because a question of fact existed on this issue, the trial court did not err by submitting the issue to the jury.

Defendant next claims that the trial court errone- ously denied its motions in limine and thereafter admit- ted evidence at trial in violation of the rules of evidence, precluded relevant testimony, and abused its discretion by the admission or preclusion of other specific evi- dence. A trial court's evidentiary decisions, preserved for review, are reviewed for an abuse of discretion. *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006). Unpreserved evidentiary issues are reviewed to determine whether there was plain error affecting a party's substantial rights. *Hilgendorf v St John Hosp and Med Ctr Corp*, 245 Mich App 670, 700; 630 NW2d 356 (2001). Any error in the admission or exclusion of evidence does not require reversal unless a substantial right of a party is affected or unless failure to do so would be inconsistent with substantial justice. MRE 103(a); MCR 2.613(A).

MRE 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the

> Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible.

MRE 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Defendant contends that evidence concerning plaintiff's coworker's actions, testimony from witnesses regarding the deceased patient's medical records, and the argument by plaintiff's counsel regarding whether plaintiff's coworker should have been terminated was irrelevant and thus inadmissible because it had no bearing on whether plaintiff was terminated for exercising a right in violation of public policy. However, under the statute relied upon by the trial court to find that plaintiff had a viable public policy cause of action, plaintiff would be protected if he were reporting the malpractice of a health care professional. Thus, whether that health care professional engaged in what could be deemed malpractice would be relevant. Thus, evidence regarding the coworker's actions/inactions, other witnesses' reviews of the deceased patient's medical records and what type of care they thought he received from the coworker and what type of care they thought he should have received, as well as the argument by counsel, if supported by the evidence, that the coworker should have been terminated, was relevant under MRE 401 and thus admissible under MRE 402.

Similarly, evidence of the coworker's performance history would be relevant. This evidence would not only be relevant to support plaintiff's claim of malpractice and his report that he was concerned that the coworker was a danger, but also to establish that the stated cause for his termination was a pretext. Because plaintiff was able to show that his coworker violated defendant's medication policy and violated other policies that listed termination as a possible punishment on several occasions without, in fact, being terminated, the evidence was relevant to his claim of pretext since he was allegedly terminated for the same actions.

Defendant further contends that the trial court abused its discretion by prohibiting evidence that absolved the coworker, such as defendant's internal death review committee's report concerning the deceased patient's death, the Bureau of Health Professions' report finding that defendant and plaintiff's supervisor had engaged in no wrongdoing, and the fact that the deceased patient's widow did not file any lawsuit against defendant, despite the fact that she had his medical records. The Bureau of Health Professions' report would be irrelevant and thus inadmissible because there was no assertion that the supervisor or defendant engaged in malpractice associated with the deceased patient's death. Plaintiff's allegation in his report was solely against his coworker. His protected activity, then, was to report the malpractice of his coworker. Therefore, a report finding that defendant and the supervisor engaged in no wrongdoing would have no bearing on that issue.

An internal report generated by defendant that plaintiff's coworker engaged in no wrongdoing would be of limited value given that the report was generated as a result of plaintiff's report that, he claims, led to his

termination. And, even if we were to find that this document should have been admitted, given the remaining evidence presented to the jury, it cannot be said that the exclusion of this singular document affected defendant's substantial rights. The fact that the deceased patient's widow did not sue defendant is of no consequence to the ultimate issue as framed by the trial court—whether plaintiff was terminated in violation of public policy for reporting the malpractice of a healthcare employee. The lack of a lawsuit does not equate with a lack of malpractice.

Finally, the trial court did not err by admitting testimony that plaintiff's supervisor allegedly falsified documents. Testimony was presented that the supervisor had received an e-mail from a now-deceased nurse concerning a prior incident with plaintiff. The date that the e-mail was received was a matter of contention, as were notations made on the e-mail. The questions concerning the e-mail's date and its authentication were brought out during examination of the supervisor, who gave her explanation concerning the date and her notations. Issues of witness credibility are for the jury to decide. *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998). Because the alleged author of the e-mail could not verify the meaning of the e-mail or the date it was sent, the jury was free to believe the supervisor's explanation or not. The trial court did not err by allowing plaintiff to bring the somewhat confusing issue before the jury for its determination.

Defendant next argues that the trial court failed to properly instruct the jury on the proper measure of damages for loss of medical benefits. We review properly preserved challenges to the jury instructions de novo on appeal. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002). However, this Court reviews

unpreserved claims of instructional error for plain error that affected substantial rights. *People v Aldrich*, 246 Mich App 101, 124-125; 631 NW2d 67 (2001).

Pursuant to MCR 2.512(C), "[a] party may assign as error the giving of or the failure to give an instruction only if the party objects on the record before the jury retires to consider the verdict . . . stating specifically the matter to which the party objects and the grounds for the objection." A party is deemed to have waived a challenge to the jury instructions when the party has expressed satisfaction with, or denied having any objection to, the instructions as given. *People v Lueth*, 253 Mich App 670, 688; 660 NW2d 322 (2002). A waiver extinguishes any instructional error and appellate review is precluded. *People v Dobek*, 274 Mich App 58, 65; 732 NW2d 546 (2007).

Defendant requested an instruction concerning the measure of damages as it related to health insurance, and the trial court denied the request. When the trial court asked if there was any objection to the instructions as read (which did not include the proposed instruction), defendant indicated that it had no objection. Affirmatively expressing satisfaction with the instructions, defendant has waived any instructional error on appeal and we need not review its allegation of error.

Defendant next argues that the trial court erred by denying its motion for judgment notwithstanding the verdict (JNOV), a new trial, or remittitur. We review de novo a court's decision on a motion for JNOV. *Reed v Yackell*, 473 Mich 520, 528; 703 NW2d 1 (2005) (opinion by TAYLOR, C.J.). When reviewing a motion for JNOV, a court must "review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a

claim as a matter of law, should the motion be granted." *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000).

The grant or denial of a motion for a new trial or remittitur is reviewed for an abuse of discretion. *Shaw v Ecorse*, 283 Mich App 1, 16-17; 770 NW2d 31 (2009). When reviewing such motions, this Court views the evidence in the light most favorable to the nonmoving party, giving due deference to the trial court's decision because of its ability to evaluate the credibility of the testimony and evidence presented to the jury. *Unibar Maintenance Servs, Inc v Saigh*, 283 Mich App 609, 629-630; 769 NW2d 911 (2009).

Defendant asserts that its motion for JNOV or a new trial should have been granted for all of the reasons set forth in its prior arguments. As already addressed, defendant's arguments fail.

With regard to remittitur, MCR 2.611(E)(1) provides that if the court finds that the only error in the trial was the excessiveness or the inadequacy of the verdict, it may deny a motion for a new trial on condition that within 14 days, the nonmoving party consents to the entry of a judgment in an amount found by the court to be the highest (if the verdict was excessive) or the lowest (if the verdict was inadequate) amount the evidence will support. In determining whether remittitur is appropriate, the proper consideration is whether the jury award was supported by the evidence. *Clemens v Lesnek*, 200 Mich App 456, 464; 505 NW2d 283 (1993); MCR 2.611(E)(1). This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented. *Palenkas v Beaumont Hosp*, 432 Mich 527, 532; 443 NW2d 354 (1989). The reviewing court should limit its consideration to:

> [(1)] whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [(2)] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and [(3)] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [*Id*. at 532-533.]

If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, the jury award should not be disturbed. *Frohman v Detroit*, 181 Mich App 400, 415; 450 NW2d 59 (1989).

In reviewing motions for remittitur, courts must be careful not to usurp the jury's authority to decide what amount is necessary to compensate the plaintiff. *Freed v Salas*, 286 Mich App 300, 334; 780 NW2d 844 (2009). Analysis of this issue thus must necessarily start with the principle that the adequacy of the amount of the damages is generally a matter for the jury to decide. *Kelly v Builders Square, Inc*, 465 Mich 29, 35; 632 NW2d 912 (2001). When reviewing the trial court's decision, we must also afford due deference to the trial court's ability to evaluate the jury's reaction to the evidence, and only disturb the trial court's decision if there has been an abuse of discretion. *Palenkas*, 432 Mich at 532.

Courts should exercise the power of remittitur with restraint. *Taylor v Kent Radiology, PC*, 286 Mich App 490, 522; 780 NW2d 900 (2009). "A verdict should not be set aside simply because the method of computation used by the jury in assessing damages cannot be determined, unless it is not within the range of evidence presented at trial." *Diamond v Witherspoon*, 265 Mich App 673, 694; 696 NW2d 770 (2005).

Defendant asserts that damages for emotional distress were not proven in this case, at least to the extent awarded, and that remittitur was appropriate. We disagree.

First, defendant did not assert that the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact and we do not see that it was. Second, defendant claims that the award was supported by only minimal, subjective evidence, but does not allege that the verdict was beyond the limits of what reasonable minds would deem just compensation for the injury sustained or that it was beyond that awarded in similar cases both within the state and in other jurisdictions. Defendant has thus not asserted that any of the factors to be considered under *Palenkas*, 432 Mich at 532-533, warrant granting remittitur.

In addition, while plaintiff's assertions that he suffered depression and was unable to support his family, was embarrassed by his termination, and was terminated from the first job he got after the termination because of the termination were subjectively reported, a plaintiff may testify regarding his or her own subjective feelings to place emotional damages at issue. *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 464; 750 NW2d 615 (2008). In *Wilson v Gen Motors Corp*, 183 Mich App 21, 40; 454 NW2d 405 (1990), a panel of this Court upheld an award of $375,000 in emotional damages when the plaintiff submitted "only testimony as to her own subjective feelings" after being terminated on the basis of race or gender. *Id.* The *Wilson* Court recognized that the trial court was in the best position to make an informed decision regarding the excessiveness, or lack thereof, of the award because it could observe the witnesses and the jury at trial. *Id.* We give

the same recognition and find that defendant has failed to establish that remittitur was warranted with respect to the award for emotional damages.

Defendant also asserts that the jury's verdict regarding plaintiff's economic loss was excessive and not supported by the evidence. According to defendant, the jury completely adopted the approach taken by plaintiff's counsel and awarded plaintiff a windfall.

The future damages awarded to plaintiff were $235,666.53 in wages. Plaintiff's expert presented a method for determining the award and testimony supporting this award. Defendant presented no testimony, expert or otherwise, to refute the method employed. Thus, the fact that the jury adopted the method for determining this award was of no surprise and the award did not, as claimed by defendant, exceed the amount supported by the evidence. Finally, defendant asserts that the jury verdict was premised on unfair and prejudicial evidence. As previously indicated, the trial court made no erroneous evidentiary rulings. Thus, this argument fails.

Affirmed.

JANSEN, P.J., and K. F. KELLY, J., concurred with SERVITTO, J.