*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JAMES STEFANSKI,

Plaintiff-Appellant,

v

SAGINAW COUNTY 911 COMMUNICATIONS
CENTER AUTHORITY,

Defendant-Appellee.

UNPUBLISHED
January 4, 2024

No. 364851
Saginaw Circuit Court
LC No. 22-046428-NZ

Before: RIORDAN, P.J., and MURRAY and M. J. KELLY, JJ.

PER CURIAM.

Plaintiff, James Stefanski, appeals as of right the trial court order granting summary disposition to defendant, the Saginaw County 911 Communications Center Authority, under MCR 2.116(C)(8) and (C)(10). At issue in this appeal is whether Stefanski's alleged report of a violation of the common law (i.e. a report of gross negligence by a fellow employee) is an activity protected under the Whistleblowers' Protection Act (WPA), MCL 15.369 *et seq*. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

In 2012, Stefanski began working for defendant as a 911 call taker/dispatcher. In November 2021, ostensibly due to a pattern of excessive nonscheduled absences (NSAs), he was suspended for 90-days without pay. Stefanski believed that the stated reasons for the discipline was pretextual and that the actual reason was his disagreement with his supervisors regarding a July 5, 2021 shooting on Burnham Street. He, therefore, resigned, and brought a suit against defendant, alleging that, in violation of the WPA, defendant had constructively discharged him in retaliation for his report to the director that the supervisor that had taken the Burnham call had been grossly negligent.

The underlying details of the July 5, 2021 call are undisputed. Supervisor Logan Bissell answered the call at approximately 4:25 a.m. The caller reported that she had heard three gunshots and that there was a female outside the house yelling for someone to call 9-1-1. The caller indicated that she believed the female had been shot and someone in the background of the call

-1-

stated that he thought the female outside had said she had been shot. Despite that information, Bissell decided to code the call as a "1010J," which indicated only that shots had been fired. If he had instead coded it as a "40J," it would have indicated that someone was shot and would have required that emergency medical services be dispatched to the scene. Because of Bissell's coding decision, no emergency medical services were sent. At approximately 5:50 a.m., the 9-1-1 caller placed another call. She stated that the female was laying on her porch and she did not know if she was breathing. The call taker who received the follow-up call, yelled to dispatch to get an update on the Burnham shooting. She was told that there was only a shots-fired incident on Burnham. Emergency medical services were dispatched to the scene. When they arrived, the female was in full cardiac arrest. She died from her injuries, and the code was changed to a Code 1, homicide.

Stefanski was not present when the initial 9-1-1 call came in. He was, however, present when the follow-up call was made. He testified that "the code obviously wasn't correct." He recalled looking at the call notes and trying to ascertain why the call could have been coded as shots-fired in light of someone stating that she the caller believed someone might have been shot. He stated and he and others pressured a supervisor into reviewing the audio. The supervisor stated that he did not hear anything out of the ordinary in the call. When questioned about his conclusion, he became angry, repeated that nothing out of the ordinary had occurred, and told Stefanski and others to "let it go."

Stefanski did not let it go. In the following days, he and others continued asking questions because "nothing added up." Eventually, Stefanski heard the audio from the initial 9-1-1 call. He concluded that Bissell had improperly coded the call as a shots-fired call, rather than a shooting. Stefanski testified that he believed the supervisors were covering for each other. He stated that, based on an internal investigation, it was determined that Bissell's actions were not negligent and that his coding of the call was nothing more than a "judgment call." Stefanski disagreed. He told two supervisors and the director, Daniel Weaver, that the call was improperly coded. It is his conversations with Weaver that form the basis for his WPA claim.

The first conversation occurred during the last week of July 2021. Stefanski had heard on the news that law enforcement was being publicly blamed for the incident, which upset him because that meant defendant was not going to do anything about the improper coding of the call which had resulted in a delayed response by law enforcement. He stated that he told Weaver:

[Y]ou've listened to it, I've listened to it, we've all listened to it, I don't think there's any ambiguity to it, there's absolutely no way that you can get that there was not somebody shot on Burnham Street. I said that in the first couple seconds of the call you could tell that [Bissell] sounded tired. It was 4:30 in the morning. They had three or four shootings that night. He sounded tired. He sounds, yeah, right on par with dispatchers at that point being just exhausted, and it sounds to me like he was very dismissive at the beginning of the phone call.

So I asked him, I said, what's going to happen here, because, you know, this is a supervisor, not—it would be different if it was just a lay person, you know, a dispatcher, but this is a supervisor, somebody who's supposed to be there to make the right judgment call. So at that point he just became dismissive and again said,

it's a judgment call; from what I heard on it, it's a judgment call and I'm not going to second guess his judgment, and that was it. That was—I mean, it was not a very long conversation to say the least but that was it.

Stefanski recalled also saying that "if that were one of us, I'd be written up or suspended or terminated, you know, but I mean, we're not going to do anything about it at all, no retraining, no—you know, because I don't think [Bissell] had really any training in his time there."

Later, after Stefanski received his second NSA letter, he went to Weaver's office to discuss the matter. During the conversation, he informed Weaver that he was having medical issues. Weaver advised that he did not want Stefanski to revert to his "old ways" regarding the accumulation of NSAs. Stefanski told Weaver that he was "having a lot of stress and anxiety due to the job," including chest pain. He attributed his increased stress to the Burnham shooting and how it had been dismissed. Stefanski testified that during his conversation with Weaver, he said

[Y]ou know, number one, I said, what's going on with [Bissell]. [Weaver] didn't really want to talk about it. He was dismissive. I get it. It's none of my business. Whatever. It's fine, but, you know, when I look at my career and I look at the center, I want to make sure this doesn't happen again.

And when you've got something going on where—I'm sorry, I feel like I would have been fired or suspended or retrained, written up, something documented somehow that this call was not handled properly, you know. I just don't—I told him, I don't understand why nothing is being done about [Bissell] messing up this call, a lady died on a porch because of us.

He looked at me and he said that he wasn't going to talk with me any further about it. He said, it's over and done with. I got upset, and I called the supervisor's group a boys club, because that's pretty much what it is, it's a boys club. If you're one of the boys, you're in the supervisor club. I told him that things are getting serious on the floor with morale over this issue. I said, it's not just a training issue.

I said, it's a morale issue, because people are talking about it and I feel like something needs to be done, and again, you know, he said, well, what do you think needs to be done, and I said, well, at least retrain, because I don't know what his call taking training was like.

I said that I had felt the urge to go to the Board with the issue because I don't feel that it was handled from within well enough. At that point [Weaver] said we should not talk about this any further, I don't want to talk about this, this is over, the conversation is cover, and I went back to the floor.

Stefanski testified that after he "started poking the bear about" Bissell, things changed: he "got shafted in the hallway" and was never called into the office except when Weaver wanted to talk about NSA policy; supervisors stopped greeting him in the morning; he got assigned "kind of the crappy things in the shift" and was made "to sit at certain places that I didn't want to sit."

Defendant moved for summary disposition under MCR 2.116(C)(8) and (C)(10), arguing that a report of gross negligence did not constitute a protected activity under the WPA because is it not a report of a violation of a law, rule, or regulation promulgate pursuant to state law. Defendant also argued that even if a report of gross negligence were actionable under the WPA, Stefanski had not made a "report" under the WPA because he did not indicate that Bissell's conduct violated a law, because he did not report any "hidden" violation of the law to Weaver, and because he did not make a charge of illegality. In response, Stefanski asserted that two statutes specifically contemplate tort liability for government actors who engage in gross negligence: the governmental tort liability act (GTLA), MCL 691.1401 *et seq*., and the Emergency 9-1-1 Service Enabling Act, MCL 484.1101 *et seq*. Additionally, gross negligence is a violation of the common law, which is a law of this state, so his report that Bissell's actions were grossly negligent was a protected activity under the WPA. He noted that MCL 15.362 does not require that the employee is only protected if he or she reports a violation of law to a public body that the public body was unaware of or that was as yet hidden from the public body's awareness. And, even if such a requirement existed, he pointed out that defendant had not taken the position that it was aware that Bissell's actions were grossly negligent.

Following oral argument, the trial court found that reporting a suspected violation of the common law was not a protected activity under the WPA, so it granted defendant's motion for summary disposition. This appeal follows.

## II. SUMMARY DISPOSITION

Stefanski argues that the trial court erred by granting summary disposition to defendant. We review de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering*, *Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009).

## B. ANALYSIS

In order to establish a prima facie case under MCL 15.362, "[t]he plaintiff must show that (1) he was engaged in a protected activity as defined by the act, (2) the defendant discharged him, and (3) a causal connection exists between the protected activity and the discharge." *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). MCL 15.362 provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Our Supreme Court has interpreted this statute to provide for three types of "protected activity" under the WPA: "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate

in an investigation." *Chandler*, 456 Mich at 399. Michigan courts have categorized whistleblowers engaging in the first two types of protected activity as "type 1 whistleblowers." *Henry v City of Detroit*, 234 Mich App 405, 410; 594 NW2d 107 (1999). The *Henry* Court stated that, "[o]n the basis of the plain language of the WPA, we interpret a type 1 whistleblower to be one who, on his own initiative, takes it upon himself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation." *Id.*

In this case, the trial court interpreted MCL 15.362 as not protecting an employee who reports to a public body of a violation of the common law. Stefanski argues that the trial court's interpretation is incorrect because the phrase "violation of law" includes violations of the common law. In support, he directs this case to dictionary definitions and caselaw supporting his position that the definition of "law" includes the common law. However, this Court has already addressed the issue of whether reporting a violation of the common law is a protected activity under the WPA, and we have concluded that it is not. See *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 532-533; 854 NW2d 152 (2014).

In *Landin*, the plaintiff was a licensed practical nurse who brought a claim asserting that he had been wrongfully terminated from his employment in violation of public policy because he had reported a coworker's negligence to a supervisor. *Id*. at 521-522. The defendant moved for summary disposition, arguing in relevant part that the plaintiff's public-policy claim was preempted by the WPA. *Id*. at 522. On appeal, the *Landin* Court examined MCL 333.20176a, which provides protection for an employee of a health facility or agency who reports or intends to report the malpractice of a health professional. *Id*. at 530. The Court concluded that MCL 333.20176a provided a statutory basis for the plaintiff's public-policy claim, so the trial court did not err by denying the defendant's motion for summary disposition. *Id*. at 532. Thereafter, the *Landin* Court considered the defendant's argument that the plaintiff's claim "falls squarely within the WPA," so the WPA was the plaintiff's exclusive remedy. *Id*. The Court examined MCL 333.20180(1), which provides that making a report of a violation of an article or rule under the Public Health Code is protected by the WPA. *Id*. The Court then concluded:

> If plaintiff was simply reporting a violation of an article or rule under the Public Health Code, defendant's argument would succeed, given that the remedies provided by the WPA are exclusive and not cumulative. However, plaintiff did not originate a report or complaint alleging a violation of the Public Health Code, he accused a coworker of malpractice. . . . There is no requirement that in order to establish a claim of malpractice, one must necessarily allege a violation of the Public Health Code. The trial court did not err by denying defendant's motion for summary disposition based on the WPA. [*Id*. at 532-533.]

Stefanski attempts to distinguish *Landin* by pointing out that the Court did not address the statutory language in MCL 15.362. However, the *Landin* Court directly held that reporting to a public body a coworker's negligence (i.e., malpractice) is not actionable under the WPA. Thus, it is directly on point to the facts of this case, which involve Stefanski reporting to a public body (Weaver) that his coworker (Bissell) was grossly negligent when he coded the Burnham call as "shots fired" rather than as a "shooting." We discern no meaningful distinction between an allegation that an individual engaged in negligence and an allegation that an individual engaged in

gross negligence.  Both are allegations that the common-law has been violated.  Therefore, we conclude that *Landin* controls the resolution of the issue on appeal.

     Affirmed.

/s/ Michael J. Riordan
/s/ Michael J. Kelly
