# STATE OF MICHIGAN

# COURT OF APPEALS

---

CHERYL NEWTON,

        Plaintiff-Appellant,

v

MARINERS INN also known as MARINERS INN
HUMAN RESOURCES and DAVID SAMPSON,

        Defendants-Appellees.

UNPUBLISHED
November 28, 2017

No. 332498
Wayne Circuit Court
LC No. 14-015394-CZ

---

CHERYL NEWTON,

        Plaintiff-Appellee,

v

MARINERS INN also known as MARINERS INN
HUMAN RESOURCES and DAVID SAMPSON,

        Defendants-Appellants.

No. 333750
Wayne Circuit Court
LC No. 14-015394-CZ

---

Before: BECKERING, P.J., and O'BRIEN and CAMERON, JJ.

PER CURIAM.

In Docket No. 332498, plaintiff, Cheryl Newton, appeals by right a circuit court order granting defendants' motion for summary disposition on her claim for wrongful discharge in violation of public policy and her claims under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*., and the Elliot-Larsen civil rights act (ELCRA), MCL 37.2101 *et seq*. In Docket No. 333750, defendants appeal an order denying their post-judgment motion for case evaluation sanctions under MCR 2.403(O), and sanctions for filing a frivolous claim under MCR 2.114(E). For the reasons stated below, we affirm the trial court's order granting defendants summary disposition on plaintiff's claims, vacate that portion of the trial court's order denying defendants' motion for case evaluation sanctions, and remand for further proceedings consistent with this opinion.

I.  BRIEF STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY

Defendant Mariners Inn is a nonprofit corporation that provides substance abuse residential treatment for homeless men.  A board of trustees manages the property, business, and affairs of Mariners Inn, and an executive committee comprised of board officers provides guidance for the board.  Plaintiff began working at Mariners Inn in 2008 as the company's finance director.  On October 17, 2014, defendant David Sampson, the chief executive officer of Mariners Inn, terminated plaintiff's employment pursuant to the company's at-will employment policy.  Plaintiff saw the discharge as retaliation for her report to the board's executive committee of what plaintiff terms as Sampson's "embezzlement of grant money."

According to plaintiff's initial deposition testimony, on September 13, 2013, Sampson processed a check reimbursing himself for the purchase of clinical curriculum materials from the Self Esteem Shop.  Plaintiff said she was apprehensive because the receipt was not one generated by the Shop, but she thought Sampson might have lost the original and employees sometimes generated receipts to obtain reimbursement for items that management knew they had purchased.  On October 9, 2013, Sampson requested a second reimbursement check for clinical curriculum from the Self-Esteem Shop using self-generated receipts.  Plaintiff said that, although she was uncomfortable doing so, she processed the request and cut the check.  She then investigated the matter with the company's program director, who thought the company got such materials for free, and with the Self Esteem Shop, which had no record of having recently sold those items, and did not even stock one of the items.  Uncertain of how to proceed, plaintiff "sought the guidance of" Alicia Klein, at that time a member of the Mariners Inn executive committee.  After plaintiff met with Klein to explain the results of her investigation, Klein arranged for plaintiff to meet with her and Samuel Abrams, who at the time served on the executive committee as president of the board.  Eventually, Abrams arranged for plaintiff to meet with him and two other members of the executive committee, at which meeting plaintiff told the members that she feared for her job since reporting Sampson.

On October 29, 2013, Abrams and two executive committee members met with Sampson and told him that someone had contacted them about the reimbursement requests.  Sampson explained that he had not intended to do anything improper; he was simply attempting to obtain reimbursement for unopened educational materials he had discovered in his office and thought he had previously purchased from the Self Esteem Shop.  He made receipts for the materials totaling $619.90 and submitted them with check requests for reimbursement and assumed plaintiff would tell him if there was an issue with his requests.

After further investigation, the executive committee determined that Sampson had not followed the appropriate procedures for issuing checks.  Sampson agreed to return the money, and Abrams issued a letter of reprimand for Sampson's "admitted failure to comply with the financial policies and procedures at Mariners Inn regarding check requests on or about September 13, 2013."  The letter required Sampson to return the $619.90 and "to take NO personnel or disciplinary actions relative to the Finance Director [i.e., plaintiff] without obtaining prior written approval from the undersigned [Samuel D. Abrams, President] on behalf of the Executive Committee."  Plaintiff testified that once she learned the executive committee had issued Sampson a letter of reprimand, she pilfered a copy of it from his personnel file to "have some proof that he couldn't fire [her]."

Plaintiff contended in her initial deposition that Sampson began to treat her differently after she reported him to the executive committee for "embezzling grant funds." Among her accusations, she claimed Sampson retaliated by taking away her job responsibilities relative to human resources (HR) and information technology (IT). Sampson sent plaintiff a letter dated October 21, 2013, expressing admiration for her "passion for the organization" and "expertise when it comes to maintaining our fiscal health," and acknowledging that, upon his request, she had assumed responsibilities outside the scope of her finance work without recompense. The letter informed her that effectively immediately, Sampson would assume direct supervision of HR and IT to allow plaintiff to "focus solely on finances and constructive strategies to help us realize our Financial Strategic Goal." Sampson closed the letter by thanking plaintiff "for [her] altruistic spirit and willingness to help improve the long-term sustainability of Mariners Inn." Plaintiff opined to Carmen Proctor, an employee whom plaintiff had been training for HR, that Sampson's explanation of the reorganization was a ruse to conceal his payback for her having reported him to the executive committee. Notably, the reorganization occurred eight days before Abrams made Sampson aware that there was an issue with the reimbursement checks.

Plaintiff also alleged that in the summer of 2014, Sampson "called her out in a management meeting saying I questioned his integrity." In a vulnerability exercise that called for participants to share significant personal stories, plaintiff recalled Sampson talking about an event that affected his life. According to plaintiff, Sampson impliedly referred to the check reimbursement incident and said "he was hurt, that he was willing to quit Mariners Inn, that he had a very hard time getting over what happened to him, and that it made him question his integrity, and other people question his integrity." Sampson stated in an affidavit that his story was not about plaintiff, but about "an incident in [his] life that occurred with a loved one that questioned whether or not [he] was still clean. . . . And it hurt my feelings that she didn't believe that I was still in recovery after 29 years." Proctor was also at the meeting and testified that she did not think Sampson was talking about the checks incident. Plaintiff admitted that Sampson never mentioned her or said what the specific situation was, but insisted nevertheless that she knew what and who he was talking about, and other people did, too, and that the story made her "feel something," embarrassment, as if she had done something wrong.

Plaintiff remembered that at her annual review on October 9, 2014, eight days before her discharge, Sampson expressed his continuing anger over the fact that she had reported him, and said that he had been "holding this in" for a long time. She recalled Sampson saying that she made people question his sobriety, and she opined, "[a]nd because he was angry and he was upset, and, as he said, he was holding it in for all this time, he fired me." Proctor, who had become the HR director, sat in on plaintiff's review at Sampson's request and took notes, later using the notes to draft a memorandum of the meeting. Proctor denied that Sampson said he had been "holding this in for a long time," and testified that, contrary to plaintiff's claims, Sampson did not say that plaintiff was out in the community bad-mouthing him; he merely observed that the checks incident had elicited negative comments from the community. According to Proctor's deposition testimony, plaintiff received an excellent evaluation and a 5% discretionary raise, and assurances from Sampson that he appreciated her for doing her job by reporting him and that he harbored no ill will toward her on that score.

According to Sampson's affidavit, plaintiff's financial work was excellent, but there had been concerns about her behavior over the past two years. Plaintiff had failed to respond to a

board member's request for information such that Sampson had to intervene, she took personal time off without following proper pre-approval and notification procedures, she had been late in providing reports, with embarrassing consequences for Sampson, and she had an ongoing, disruptive feud with chief operating officer, Carina Jackson. Proctor, Jackson, and plaintiff testified to plaintiff's feud with Jackson; Proctor noting that at one point the two had engaged in a virtual screaming match in front of employees. Sampson said in addition that plaintiff had offended employees and others when, after observing one African-American woman combing the hair of another African-American woman, plaintiff exclaimed, "Look, they are acting just like monkeys!'" and "That's what monkeys do to find food."

Sampson said his decision to discharge plaintiff arose from plaintiff's response to a new board member at the October 17, 2014 executive committee meeting. According to Sampson, plaintiff was presenting the budget for 2014-2015, but in a way that committee members could not understand it. The new board treasurer, Erik Tungate, suggested she present it in a more user-friendly way, and noted that the healthcare budget did not reflect the organization's actual healthcare expenditures. Sampson said, "Ms. Newton became defiant in her body language and tone of voice. She attempted to stare him into submission. Additionally, she indicated that she did not intend to comply with his recommendations because she was presenting the budget in the same manner that she had always done it." After the meeting, Sampson dismissed the staff from the room and asked the executive committee for guidance on how to address plaintiff's improper behavior. The committee expressed concern that she was "continuously disrespectful and disregarded requests made by the Board for [i]nformation." Ultimately, Sampson asked the executive committee to terminate her employment and, on consulting with counsel by telephone, the committee agreed. Sampson said that he and Abrams informed the executive committee about the written reprimand in Sampson's file, the members reviewed it, and, in accordance with its requirements, Abrams signed a letter granting him permission to discharge plaintiff. At approximately 1:00 that afternoon, Sampson called Proctor and plaintiff into the boardroom, where attorney John Gillooly informed plaintiff that Mariners Inn was severing its employment relationship with her on grounds of its at-will employment policy.

On December 3, 2014, plaintiff filed a two-count complaint against defendants alleging wrongful discharge in violation of public policy (hereafter "public policy claim") and a violation of the WPA, MCL 15.361 *et seq*. Approximately eight months later, after key witnesses had been deposed, plaintiff amended her complaint to add counts of race discrimination in violation of the ELCRA, MCL 37.2701 *et seq*., and retaliation in violation of the ELCRA. On January 25, 2016, defendants filed a motion and supporting briefs for summary disposition pursuant to MCR 2.116(C)(8) and MCR 2.116(C)(10). The trial court granted defendants' motion on plaintiff's public policy claim because plaintiff failed "to cite sufficient legislative policy to imply a cause of action for wrongful termination," and on her WPA claim because she did not report Sampson's violation or suspected violation of law to a "public body." The court dismissed plaintiff's claim of race discrimination in violation of the ELCRA because, assuming for the sake of argument that plaintiff made a prima facie case for race discrimination, defendants cited a legitimate reason for her discharge and plaintiff failed to put forth evidence showing that race was a motivating factor in her termination. Finally, the trial court dismissed the claim of

retaliation in violation of the ELCRA because plaintiff failed to present evidence that the behavior she opposed violated the ELCRA.[1]

On May 10, 2016, defendants filed a post-judgment motion for attorney fees, costs pursuant to MCR 2.403(O) (1) case evaluation sanctions, and MCR 2.114(E) (sanctions for filing a frivolous complaint). The trial court denied defendant's motion for case evaluation sanctions "in the interests of justice," MCR 2.403(O)(11), and their request for sanctions under MCR 2.114(E) because the court did not find plaintiff's case frivolous.

## II. ANALYSIS

### A. DOCKET NO. 332498

Defendants moved for summary disposition pursuant to MCR 2.116(C)(8) and (10). A motion under MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Ernsting v Ave Maria College*, 274 Mich App 506, 509; 736 NW2d 574 (2007). When reviewing a motion for summary disposition under MCR 2.116(C)(8), a trial court considers only the pleadings, accepting as true all well-pleaded allegations and construing them in the light most favorable to the nonmovant. *Id*. "A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id*. (quotation marks and citation omitted). "A motion under MCR 2.116(C)(10) tests the factual support for a claim and should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anzaldua v Neogen Corp*, 292 Mich App 626, 630; 808 NW2d 804 (2011). "The nonmoving party may not rest on the allegations in the pleadings, but must set forth, through documentary evidence, specific facts demonstrating a genuine issue for trial." *Id*. This Court reviews de novo a trial court's grant of summary disposition pursuant to MCR 2.116(C)(8) and (10). *Ernsting*, 274 Mich App at 509.

### 1. PUBLIC POLICY CLAIM

Plaintiff first contends that the trial court erred in summarily dismissing her claim for wrongful discharge in violation of public policy. We disagree.

Michigan law generally presumes employment relationships to be at-will, which means that either party may terminate the relationship at any time for any reason or for no reason. *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569, 572-573; 753 NW2d 265 (2008). However, there are exceptions to at-will termination where the grounds for termination "are so

---

[1] Plaintiff claims on appeal that she also alleged a count of hostile work environment. Neither plaintiff's complaint nor her amended complaint supports this assertion, and we decline to address it now. *Burns v City of Detroit (On Remand)*, 253 Mich App 608, 614, modified 468 Mich 881; 658 NW2d 468 (2003) (observing that issues raised for the first time on appeal ordinarily are not subject to review).

contrary to public policy as to be actionable." *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 695; 316 NW2d 710 (1982).

> [T]he only grounds that have been recognized as so violative of public policy that they serve as an exception to the general rule of at-will employment are: (1) explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty (e.g., the Civil Rights Act, MCL 37.2701; the Whistleblowers' Protection Act, MCL 15.362; the Persons With Disabilities Civil Rights Act, MCL 37.1602), (2) where the alleged reason for the discharge was the failure or refusal of the employee to violate a law in the course of employment (e.g., refusal to falsify pollution reports; refusal to give false testimony before a legislative committee; refusal to participate in a price-fixing scheme), and (3) where the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment (e.g., retaliation for filing workers' compensation claims). [*Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 524; 854 NW2d 152 (2014), citing *Suchodolski*, 412 Mich at 695-696.]

Public policy exceptions do not apply "when a plaintiff alleges discharge in retaliation for engaging in activity protected by the WPA." *McNeill-Marks v MidMich Med Ctr*, 316 Mich App 1, 25; 891 NW2d 528 (2016). Relative to the instant appeal, the WPA protects employees who report an employer's violation or suspected violation of the law from retaliation by the employer, MCL 15.362. Where the WPA applies, it "provides the exclusive remedy for such retaliatory discharge and consequently preempts common-law public-policy claims arising from the same activity." *NcNeill-Marks*, 316 Mich App at 25.

Plaintiff asserts that her refusal to violate the law, her right to exercise personal time off, and her duty to report the "embezzlement of grant funds" are activities protected by public policy. To the extent that plaintiff asserts that Sampson discharged her in part for taking off personal time to which she was entitled, plaintiff misconstrues Sampson's testimony. Sampson's complaint was not that plaintiff took time off to which she was not entitled, but that she took it off without the proper advance notice and approval. Regardless, plaintiff cannot sustain a public policy claim on grounds related to her exercise of personal time off because she has not shown that such right is "conferred by a well-established legislative enactment." *Landin*, 305 Mich App at 524.

Next, there is no record evidence that plaintiff was ever asked to violate the law, let alone refused to violate it. Moreover, to the extent that plaintiff "refused to violate the law" or fulfilled her purported duty to report the "embezzlement of grant funds" by reporting Sampson's suspected violation of the law to the executive committee, this is activity protected by the WPA. There is no logical distinction between refusing to violate the law or fulfilling a duty to report the "embezzlement of grant money," and making a report to the executive committee, the act by which plaintiff manifested that refusal and executed that duty. See *McNeill-Marks*, 316 Mich App at 26. Thus, to the extent that plaintiff's protected activity entailed reporting her suspicions to the executive committee, the WPA provides her exclusive remedy and preempts common-law public-policy claims arising from her reporting activity. *Id*. at 25.

-6-

## 2. WHISTLEBLOWERS' PROTECTION ACT

Plaintiff next alleges that her employment was terminated in violation of section 2 of the WPA, which provides in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body . . . . [MCL 15.362.]

To establish a prima facie case under this statute, a plaintiff must show that "(1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 183-184; 665 NW2d 468 (2003). " 'Protected activity' under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *McNeill-Marks*, 316 Mich App at 16-17, quoting *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). A licensed and practicing member in good standing of the State Bar of Michigan is a member of a "public body" for purposes of the WPA. *McNeill-Marks*, 316 Mich App at 21-23.[2]

A plaintiff can rely on either direct or indirect evidence to establish his or her prima facie case. *Id*. at 17. "Direct evidence" is evidence that, "if believed, requires the conclusion that unlawful [retaliation] was at least a motivating factor in the employer's actions." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001) (quotation marks and citation omitted); *McNeill-Marks*, 316 Mich App at 17. Plaintiff asserts that the first two elements of her prima facie case are indisputably met, and that she presented direct evidence of the third element— causation—when she testified that Sampson was seething with anger at her for having snitched him out. "Anger," plaintiff declares, is the "gold standard" of causation pursuant to *West*. In our opinion, plaintiff reads more into *West* than is warranted. At issue was whether an adverse employment action that followed closely after the adversely affected employee engaged in activity protected under the WPA was evidence of a causal link between engagement in the protected activity and the adverse employment action. *West*, 469 Mich at 185-186. The *West* Court explained that temporal proximity alone did not constitute a causal link, but said that

---

[2] The defendant medical center filed an application for leave to appeal the decision in *McNeill-Marks*. After hearing oral argument on whether to grant the application or take other action, our Supreme Court directed the parties to provide additional supplemental briefs addressing, among other things, whether the plaintiff's communication to her attorney amounted to a "report" as that word is used in Section 2 of the WPA. *McNeill-Marks v MidMich Med Ctr-Gratiot*, 500 Mich 1031; 897 NW2d 176 (Mem) (2017). The application for leave to appeal is still pending.

temporal proximity accompanied by a strong emotional reaction, such as anger, might constitute such link. *Id*. at 186-187. The point of *West* was that temporal proximity, alone, does not constitute a causal link, not, as plaintiff would have it, that anger alone does. Rather than stand for the proposition that anger alone signifies a causal link, *West* indicates that the totality of the circumstances should be taken into account when considering causation. Thus, anger alone is not direct evidence of causation.

Plaintiff further asserts that she has direct evidence in the form of Sampson admitting that he fired her for reporting that Jackson had potentially misappropriated company resources. The record does not support plaintiff's assertion. Although Sampson was concerned about plaintiff's ongoing feud with Jackson and did not think it contributed positively to the organization, and plaintiff accused Jackson of improprieties at her October 9, 2014 annual review with Sampson, there is no record evidence that Sampson told plaintiff that he terminated her employment in part because of her allegations against Jackson.

Where, as here, there is no direct evidence, the plaintiff must proceed through the steps set forth in *McDonnell Douglas* 411 US 792, 802-803; 93 S Ct 1817, 1824-1825; 36 L Ed 2d 668 (1973). *Hazle*, 464 Mich at 462; *Debano-Griffin v Lake County*, 493 Mich 167, 171; 828 NW2d 634 (2013) (noting that the *McDonnell Douglas* analytical framework applies in WPA cases where there is no direct evidence of unlawful retaliation.) Under *McDonnell Douglas*, a plaintiff can establish a rebuttable prima facie case "on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful [retaliation]." *Hazle*, 464 Mich at 462 (quotation marks and citation omitted). If the plaintiff succeeds, a presumption of retaliation arises. *Id*. at 463. Once the plaintiff establishes a prima facie case, the burden then shifts to defendant "to articulate a legitimate, [non-retaliatory] reason for its employment decision in an effort to rebut the presumption created by plaintiff's prima facie case." *Id*. at 464. If the defendant meets this burden, the presumption of retaliation "drops away." *Id*. at 465. Then, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence, "when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that [retaliation] was a motivating factor" for defendants' employment action. *Id*. (quotation marks and citation omitted).

In the case at bar, the trial court dismissed plaintiff's claim under the WPA on the ground that she did not report a violation or suspected violation to a "public body." However, while plaintiff's appeal was pending, this Court issued a published decision holding that a Michigan-licensed attorney and member in good standing of the State Bar of Michigan is a "public body" for purposes of the WPA. *McNeill-Marks*, 316 Mich App at 23. Judicial decisions are generally given complete retroactive effect. *Lincoln v Gen Motors Corp*, 231 Mich App 262, 267; 586 NW2d 241 (1998). Accordingly, plaintiff contends that *McNeill-Marks* is "exactly on point" with what plaintiff did, and compels reversal of the trial court's ruling.

In *McNeill-Marks*, the plaintiff, a clinical manager employed by the defendant, MidMichigan Medical Center-Gratiot (MMCG), telephoned her attorney, Richard Gay, when Marcia Fields, a woman against whom Gay had helped plaintiff obtain a PPO, showed up at MMCG in violation of the PPO. *McNeill-Marks*, 316 Mich App at 7-10. The plaintiff did not tell Gay that Fields was a patient at MMCG, and asked Gay not to have a newly issued PPO served on her. *Id*. at 10. Nevertheless, through a series of coincidences, the PPO was served on

Fields in her hospital room. Fields and her family reported the incident to MMCG as a suspected violation of the federal Health Insurance Portability and Accountability Act (HIPPA). *Id*. at 11. During the MMCG's investigation of the alleged HIPPA violation, the plaintiff acknowledged to MMCG's privacy officer that she told Gay that Fields was at MMCG, but denied telling him that Fields was a patient there. *Id*. at 11-12. Having learned of an upcoming hearing on the plaintiff's motion to hold Fields in contempt, the privacy officer threatened the plaintiff with termination if she testified at the hearing "regarding her interaction with Fields" at MMCG. *Id*. at 12. The privacy officer concluded that plaintiff had violated HIPPA and MMCG's privacy policies, and the plaintiff was discharged. *Id*.

The plaintiff filed a complaint, alleging in relevant part that MMCG discharged her in violation of the WPA either because she reported Fields' violation of the PPO to Gay or she was about to report it to the circuit court. *Id*. at 13. MMCG moved for summary disposition on the ground that the plaintiff never reported a violation or alleged violation to a "public body." *Id*. The trial court agreed, reasoning that the plaintiff's telephone communication with Gay was not a report to a public body for purposes of the WPA. *Id*. at 15. On appeal this Court held that because Gay was a licensed attorney and member in good standing of the State Bar of Michigan, a body "created by" state authority and, through regulation of our Supreme Court, "primarily funded by or through" state authority, Gay was a public body for purposes of the WPA.[3] After determining that a causal connection existed between the discharge and the plaintiff's report to Gay, this Court concluded that a genuine issue of material fact remained regarding whether the plaintiff's report was a motivating factor in MMCG's decision to discharge the plaintiff. *Id*. at 24-25.

In the case at bar, plaintiff asserts that she reported to a "public body" when she met at an offsite location with executive committee members Abrams, Dorothy Brown, and Ebony Duff, who is also an attorney and member in good standing of the Michigan bar. However, unlike the plaintiff in *McNeill-Marks,* who reported to Gay because he was her attorney, the record evidence in this case indicates that, if plaintiff did "make a report" to Duff, it was at the behest of Abrams and because Duff was a member of the executive committee, not because she was an attorney. Further, plaintiff's assertion that Duff was an attorney for Mariners Inn finds no support in the record; there is no record evidence of an attorney-client relationship between Duff and Mariners Inn or of Duff performing specific legal work on behalf of Mariners Inn. Plaintiff testified that she intended to follow the policy of Mariners Inn and reported the matter internally at first. Only the coincidence of *McNeill-Marks* with the fact that a member of the executive committee just happened to be an attorney and member of the State Bar of Michigan allows plaintiff now to claim that she actually "made a report . . .to a public body." MCL 15.362.

Even if we assume for the sake of argument that plaintiff established a rebuttable prima facie case under the WPA, *Hazle*, 464 Mich at 462, defendants rebut that presumption with

---

[3] The WPA's definitions of "public body" include a "body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body." MCL 15.361(d)(*iv*).

evidence of legitimate reasons for discharging plaintiff. As previously indicated, Sampson reported that plaintiff had failed to respond to a board member's request for information, took personal time off without following proper pre-approval and notification procedures, had been late in providing necessary reports, and waged an ongoing, disruptive feud with Jackson. Sampson submitted e-mails supporting his testimony about plaintiff's attendance and untimeliness with reports. Proctor, Jackson, and plaintiff all testified to plaintiff's feud with Jackson. And notes Sampson had handwritten over time document that plaintiff had offended employees and others with her comments about monkeys. According to Sampson, the tipping point came at the executive committee meeting on October 17, 2014, when plaintiff responded to the new treasurer's questions and recommendations in a way that all present considered rude. Untimely or unavailable financial reports, taking time off without obtaining pre-approval and disrespectful behavior to board members are all lawful reasons for discharging plaintiff.

Under the last stage of the *McDonnell Douglas* analysis, plaintiff could avoid summary disposition if she demonstrates "that the evidence in this case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that [retaliation] was a motivating factor" for defendants' employment action. *Hazel*, 464 Mich at 465 (quotation marks and citation omitted). It is not enough for plaintiff to "raise a triable issue that [defendants'] proffered reason[] was pretextual, but that it was a pretext for [unlawful retaliation]." *Id*. at 465-466. Plaintiff provides no evidence other than insistent speculation that retaliation was a motivating factor in her discharge. Therefore, the publication of *McNeill-Marks* does not require reversal of the trial court's summary disposition of plaintiff's WPA claim.

### 3. ELLIOT-LARSON CIVIL RIGHTS

Plaintiff contends that she proved a prima facie case for race discrimination and race-based retaliation, and so the trial court erred in dismissing her claims under the ELCRA. We disagree.

### A. RACE DISCRIMINATION

To establish a prima facie case of race discrimination, a plaintiff must present evidence that he or she (1) belongs to a protected class, (2) suffered an adverse employment action, (3) was qualified for her position, and (4) others who are similarly situated and not members of the protected class did not suffer adverse employment actions. See *Town v Mich Bell Tel Co*, 455 Mich 688, 695; 568 NW2d 64 (1997). If the plaintiff establishes his or her prima facie case using circumstantial evidence, the burden-shifting analysis set forth in *McDonnell Douglas* and described above applies. Because plaintiff, in the case at bar, did not present direct evidence of race discrimination, the *McDonnell Douglas* analysis applies. *Hazle*, 464 Mich at 462.

Assuming for the sake of argument that plaintiff established the first three prongs of her prima facie case, her race discrimination claim fails nevertheless because she has not established the fourth prong. Plaintiff sets forth 10 reasons she considers "overwhelming evidence" that defendants used race as a factor in job decisions. However, our review of the record leads us to conclude that her purported reasons are largely argumentative and subjective interpretations that substitute inflammatory language for logic and legal reasoning, and that none of them establish a prima facie case for race discrimination.

Plaintiff asserts that in a prior period of employment with Mariners Inn, Jackson took unearned personal time without suffering adverse consequences, while she "is fired for not giving proper notice for taking what she is entitled to." However, plaintiff errs in stating that defendants fired her simply for failing to give proper notice when taking personal days and overlooks the constellation of behaviors that Sampson cited as legitimate reasons for her discharge, and which distinguish plaintiff's situation from that of Jackson. Plaintiff asserts that Proctor agreed with her that Sampson favored Jackson because of her race. According to plaintiff's own testimony, however, what Proctor agreed to was not that Sampson favored Jackson because she was black, but that Sampson favored Jackson "because they were in the same . . . cultural-based group." Moreover, the cultural-based group was not a "black thing," and there were African-Americans at Mariners Inn who were not part of the group defined by the "no-snitch" culture, including Proctor. Plaintiff's allegation that whether one is fired for "stealing grant money" depends on one's race invites a comparison between discharged employee Robert Houston, a Caucasian who obtained reimbursements from petty cash using fraudulent receipts, and reprimanded employee Sampson, an African-American who engaged in essentially the same activity. What plaintiff fails to mention is that the scale of Houston's operation distinguishes him from Sampson. Moreover, to the extent that plaintiff's department was involved in the investigation and discharge of Houston, plaintiff cannot fairly point to it as evidence that defendants make race-based employment decisions. Plaintiff also asserts that whether one may "take 2-hour lunches, wear tennis shoes on non-casual days, and wear stretch pants and informal attire depends on one's race or membership in the "cultural-based group." However, when questioned at her deposition, plaintiff admitted that she had attempted none of these things, and opined that Sampson probably would not discipline her if she took a 2-hour lunch. Finally, plaintiff asserts that Sampson "took the Bridge Card duties" away from her and gave them to Jackson because the latter was black, and took away her IT and HR duties and gave them the Jackson and Proctor respectively because they were black. In each of these cases, however, Sampson articulated a legitimate business reason for his decision, and plaintiff did not present evidence that his reasons were pretexts for race-based decisions.

We conclude that plaintiff has not provided evidence of similarly situated African-American employees who were not discharged, nor has she provided evidence that defendants did not have legitimate reasons for any of the employment decisions of which she complains, nor has she presented evidence—not just self-serving assertions of her opinion—that defendants' employment decisions were race-based. Because plaintiff did not present evidence establishing the fourth prong of a prima facie case for race discrimination, the trial court did not err in dismissing her claim of race discrimination in violation of the ELCRA.

## B. RETALIATION UNDER THE ELCRA

Pursuant to MCL 37.2701(a) of the ELCRA, two or more persons shall not conspire to, or a person shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Plaintiff asserts that she engaged in protected activity when she complained to Proctor that Jackson was doing things she should not, and that Proctor agreed that race was a factor, and when she "complained to Defendant Sampson himself about this, in particular she complained in writing that he was having his friend, COO Jackson [sic], and that she was afraid to bring this to his

attention because he might fire her." From our review of the record, we conclude that neither of the activities plaintiff claims to have engaged in were protected under the ELCRA.

As an initial matter, we note that plaintiff did not allege retaliation in violation of the ELCRA in her original complaint, and there is no record evidence that plaintiff was concerned initially about race being a factor in any of defendants' employment decisions, let alone in their decision to terminate her employment. In her second deposition, taken after plaintiff amended her complaint to assert causes of action under the ELCRA, plaintiff did indeed indicate that employees were treated differently at Mariners Inn, but not because of their race. Plaintiff explained that employees receive different treatment based on their membership in a "cultural-based" group, the boundaries of which were defined primarily by adherence to the principle of "no snitching." According to her testimony, not all blacks belonged to this cultural-based group, and plaintiff could have been part of the group had she elected to adhere to the no-snitching principle.

Regarding plaintiff's assertion that she complained to Proctor that Jackson was allowed to do certain things because she was black, the record shows that plaintiff testified that Jackson received special treatment not because of her race, but because she and Sampson were part of the same "cultural-based" group of which neither plaintiff nor Proctor, who is African-American, were a part. Even if plaintiff did complain to Proctor that Sampson favored Jackson because of her race, plaintiff cannot prove a causal connection between her alleged complaints of racial discrimination and her termination; Proctor was not part of the discharge decision and was surprised when it happened. Therefore, any claim of retaliation based on race that involves statements made to Proctor must fail.

Plaintiff's alleged complaint to Sampson presumably refers to allegations plaintiff made at her October 9, 2014 annual review that Jackson had used a company van and employees for a family reunion, and had "possibly" paid the employees from payroll. When Sampson asked plaintiff why she had not mentioned this before, Proctor's memorandum indicates that plaintiff "stated that based on his relationship with [Jackson], she feared for her job. As already explained, this relationship arose not from race, but from a purportedly shared "cultural-base." The vagueness of plaintiff's complaint that Jackson received special treatment because of her friendship with Sampson does not rise to the level of activity protected by the ELCRA. *Booker v Brown & Williamson Tobacco Co, Inc*, 879 F2d 1304, 1314 (CA 6, 1989)[4] (noting that the plaintiff's "vague reference to 'enthnocism' in internal correspondence to his employer" was insufficient to invoke the protections of the ELCRA). "An employee may not invoke the protections of the [ELCRA] by making a vague charge of discrimination." *Id*. at 1313.

Even if we conclude that plaintiff did state a cause of action under the ELCRA, which we do not, plaintiff's claim still fails because she has not established that her engagement in protected activity constituted a significant factor in her discharge. To establish a prima facie case of retaliation under the ELCRA, plaintiff must show "(1) that [she] engaged in protected

_____

[4] "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

activity; (2) that this was known by defendant[s]; (3) that defendant[s] took adverse employment action; and (4) that there was a causal connection between [her] protected activity and the adverse action." *In re Rodriguez*, 487 F 3d 1001, 1011 (CA 6, 2007). To establish causation, plaintiff "must show that [her] participation in activity protected by the [ELCRA] was a significant factor in [defendants'] adverse employment action, not just that there was a causal link between the two." *Id*. (quoting *Barrett v Kirtland Community College*, 245 Mich App 306, 315; 628 NW2d 63 (2001)). A "significant factor" is more than a mere causal link, but less than a "but-for" cause. *Polk v Yellow Freight Sys, Inc*, 801 F 2d 190, 199 (CA 6, 1986). "A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Id*.

Plaintiff's bald assertion that "race was a factor in her termination" is insufficient to create a causal link between her purported engagement in protected activity and her discharge. *Id*. To establish a prima facie case of race-based retaliation, plaintiff has to present evidence that race was more than a "factor" in her termination, or even a "cause" of her termination; she has to show that it was a "significant" factor. *Id*. This she has not asserted, let alone shown. Plaintiff merely alleges that her discharge occurred after she engaged in protected activity that Sampson knew about. These allegations—even if verified by the record—are insufficient to establish a prima facie case. See *Booker*, 879 F 2d at 1314. Even if plaintiff had established a prima facie case of retaliation based on race, she presented no direct evidence of retaliation in violation of the ELCRA; therefore, the *McDonnell Douglas* analysis applies. *Hazle*, 464 Mich at 466. As has already been demonstrated, plaintiff's claim cannot survive this analysis.[5]

## B. DOCKET NO. 333750

This Court reviews a trial court's decision to grant or deny case evaluation sanctions de novo. *Harbour v Corr Med Servs*, 266 Mich App 452, 465; 702 NW2d 671 (2005). The Court reviews a trial court's decision whether to deny an award of costs pursuant to "the interest of justice," MCR 2.403(O)(11), for an abuse of discretion. *Id*. "An abuse of discretion occurs if the trial court's decision falls outside the range of principled outcomes." *Macomb Co Dep't of Human Services v Anderson*, 304 Mich App 750, 754; NW2d 408 (2014).

Pursuant to MCR 2.403(O)(1), "[i]f a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is

---

[5] Plaintiff's assertion that Proctor and Sampson's failure to investigate her allegations "creates a question of fact such that Defendants' [motion for summary disposition] must be denied and this case submitted to a jury for resolution" is unavailing. The cases plaintiff relies upon for support of her proposition address claims of hostile workplace environment, indicating in part that an employer's failure to investigate claims of workplace harassment based on sex (*Meyer*) or race (*Jackson*) can constitute an adverse employment action or discriminatory act. See *Meyer v City of Centerline*, 242 Mich App 560, 571; 619 NW2d 182 (2000) and *Jackson v Quanex Corp.*, 191 F3d 647, 665 (CA 6, 1999). These cases have no bearing on the issue of whether defendants' discharge of plaintiff was retaliation for her alleged engagement in an activity protected under the ELCRA.

more favorable to the rejecting party than the case evaluation." For purposes of this rule, a "verdict" includes "a judgment entered as a result of a ruling on a motion after rejection of the case evaluation." MCR 2.403(O)(2)(c). "If the 'verdict' is the result of a motion as provided by [the foregoing subrule], the court may, in the interest of justice, refuse to award actual costs." MCR 2.403(O)(11). As this Court explained in *Haliw v City of Sterling Hts (On Remand)*, 266 Mich App 444, 448; 702 NW2d 637 (2005) (quotation marks and citations omitted):

> The term "interest of justice" in MCR 2.403(O)(11) must not be too broadly applied so as to swallow the general rule of subsection 1 and must not be too narrowly construed so as to abrogate the exception. This Court further held that factors normally present in litigation, such as a refusal to settle being viewed as reasonable, or that the rejecting party's claims are not frivolous, or that disparity of economic status exists between the parties, are insufficient without more to justify not imposing sanctions in the "interest of justice." Rather, the unusual circumstances necessary to invoke the "interest of justice" exception may occur where a legal issue of first impression is presented, or
>
>> where the law is unsettled and substantial damages are at issue, where a party is indigent and an issue merits decision by a trier of fact, or where the effect on third persons may be significant . . . .

If "the trial court finds on the basis of all the facts and circumstances of a particular case and viewed in light of the purposes of MCR 2.403(O) that unusual circumstances exist, it may invoke the 'interest of justice' exception found in MCR 2.403(O)(11)." *Id*. at 449 (quotation marks and citation omitted). If the exception does apply, "the trial court may, in the exercise of its discretion, refuse to award any costs or attorney fees, or may award something less than 'actual costs,' i.e., something less than taxable costs and reasonable attorney fees." *Id*. (quotation marks and citation omitted). However, the trial court must "articulate the bases for its decision." *Id*. (quotation marks and citation omitted).

In the case at bar, the trial court erred in its ruling, but the nature of its error is not clear. Defendants filed a "motion for attorneys' fees as sanctions for plaintiff filing a frivolous complaint, and as case evaluation sanctions" pursuant to MCR 2.114(E) (frivolous complaint), and MCR 2.403(O) (case evaluation sanctions). At the conclusion of the hearing on the motion, the trial court ruled from the bench as follows:

> Under MCR 2.403(O)(11), it specifically cites if the verdict is a result of a motion as provided by sub rule 02-C the court may in the interest of justice refuse to award actual costs. Your motion is denied. I did not find this to be a frivolous [sic] at all. In fact, it was a close call on my part. So your motion is denied. You may file the order and I will sign it.

On June 22, 2016, the trial court signed a corresponding order stating in relevant part, "Defendants' motion entitled, *'Motion for Attorneys' Fees as Sanctions for Plaintiff Filing a Frivolous Complaint, and As Case Evaluation Sanctions'* is DENIED for the reasons stated on the record."

Defendants contend that the trial court denied their motion for case evaluation sanctions on the ground that plaintiff's complaint was not frivolous. Under this interpretation of the court's reasoning, the trial court erred by applying the interest of justice exception solely on the ground that plaintiff's complaint was not frivolous. *Haliw*, 266 Mich App at 448. In addition, in order to reconcile the trial court's ruling from the bench with its order denying defendants' motions for case evaluation sanctions *and* sanctions for filing a frivolous claim, MCR 2.114(E), one must infer that the trial court denied both claims on the same ground, i.e., that plaintiff's claim was not frivolous. Plaintiff contends that defendants misapprehend the trial court's explanation, and that the trial court denied the motion for case evaluation sanctions in the interest of justice, and the motion for sanctions under MCR 2.114(E) because plaintiff's claim was not frivolous. Under this interpretation, however, the trial court erred by not articulating the base(s) for its decision to apply the interest of justice exception.

The trial court erred under either interpretation of its ruling. As indicated above, finding that plaintiff filed a non-frivolous complaint, without more, is not grounds for application of the interest of justice exception to deny otherwise mandatory case evaluation sanctions under MCR 2.403(O)(1). Plaintiff contends that public policy supports application of the interest of justice exception in civil rights cases because the imposition of case evaluation sanctions would discourage litigants from seeking judicial redress for civil rights violations. The flaw in plaintiff's logic is that a civil rights litigant who engages in case evaluation has already brought a claim; the purpose of imposing any applicable sanctions is to encourage the settlement of that claim and to discourage unnecessarily protracted litigation. See *Smith v Khouri*, 481 Mich 519, 527-528; 751 NW2d 472 (2008). Plaintiff also contends that this case warrants application of the interest of justice exception due to the unsettled nature of the law involving WPA and public policy claims. In support of this claim, plaintiff points to two recently published cases: *Landin*, 305 Mich App 519 (2014) and *McNeill-Marks*, 316 Mich App 1 (2016). Neither of these cases supports plaintiff's argument. *Landin* actually confirmed that trial courts do not have "unfettered discretion or authority to determine what may constitute sound public policy exceptions to the at-will employment doctrine," and that public policy "must ultimately be clearly rooted in the law." *Landin*, 305 Mich App at 525. And, even if *McNeill-Marks* did allow plaintiff to argue that she reported to a "public body," fatal to plaintiff's WPA claim was her failure to meet her burden of proof under the well-established analytical framework of *McDonnell Douglas* by providing evidence that retaliation was a motivating factor in defendants' otherwise legitimate employment action.

## III. CONCLUSION

We affirm the trial court's grant of summary disposition to defendants on plaintiff's complaint. However, the trial court erred in its application of MCR 2.403(O)(11) to deny defendants' motion for case evaluation sanctions. Therefore, we vacate that portion of the trial court's order denying defendants' motion for case evaluation sanctions and remand for further proceedings, wherein the trial court may either award defendants case evaluation sanctions pursuant to MCR 2.403(O)(1) or articulate a valid basis for refusing to award costs in the interests of justice pursuant to MCR 2.403(O)(11). We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Colleen A. O'Brien
/s/ Thomas C. Cameron