*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CLEVELAND STEGALL,

        Plaintiff-Appellant,

v

RESOURCE TECHNOLOGY CORPORATION,
doing business as BRIGHTWING, and FCA US,
LLC,

        Defendants-Appellees.

FOR PUBLICATION
February 2, 2023

No. 341197
Oakland Circuit Court
LC No. 2016-155043-CD

Before: JANSEN, P.J., and GLEICHER, C.J. and BORRELLO, JJ.

GLEICHER, C.J. (*dissenting*).

The Supreme Court remanded this case for our consideration of three questions: "whether plaintiff has established a prima facie claim that he was discharged in violation of public policy, whether plaintiff's public-policy claim is nonetheless preempted by either state or federal law, and whether arguments that the claim has been preempted are preserved." *Stegall v Resource Technology Corp*, ___ Mich ___; 976 NW2d 667, 668 (2022) (*Stegall II*). The majority holds that plaintiff Cleveland Stegall's public-policy tort claim is preempted, despite that this argument was not preserved.

At its core, this case concerns a question the Supreme Court did not ask: whether the cause of action for public-policy tort described in *Suchodolski v Mich Consol Gas Co*, 412 Mich 692; 316 NW2d 710 (1982), has continuing vitality given the Supreme Court's subsequent decision in *Dudewicz v Norris-Schmid, Inc*, 443 Mich 68; 503 NW2d 645 (1993), overruled in part on other grounds by *Brown v Detroit Mayor*, 478 Mich 589, 594 n 2; 734 NW2d 514 (2007). My answer is that *Dudewicz* gravely wounded *Suchodolski* and has left a trail of confusion in its wake. But a fair reading of *Dudewicz* supports that Stegall's public-policy tort claim is not preempted.

*Suchodolski* formally recognized a common-law tort claim arising from the retaliatory discharge of an employee who reports unlawful activity. *Dudewicz* narrowed *Suchodolski* by eliminating public-policy tort claims where a statute prohibits retaliation. The majority opinion dovetails with some of the language in *Dudewicz*, but clashes with another portion. This case

offers the Supreme Court an opportunity to clarify *Dudewicz*'s contradictory strands and to fully restore *Suchodolski*'s original holding. I write to explain why Stegall's retaliation claim should survive, and why my interpretation of *Suchodolski* should prevail.

## I. PUBLIC-POLICY TORT CLAIMS AND PREEMPTION

In *Suchodolski*, 412 Mich 692, the Supreme Court formally recognized a cause of action for wrongful discharge grounded in an employer's violation of a well-established public-policy. Public-policy tort claims rest on the non-controversial notion that employees who shine a light on law-breaking or insist on following legal rules should not lose their jobs for having done so. After all, an employee who refuses to engage in illegal conduct or reveals workplace illegality contributes to enforcement of the rule of law. Tort remedies in these cases include a full gamut of compensatory damages for back pay, front pay, mental distress, and attorney fees.

In *Suchodolski*, the Supreme Court explained that "some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id*. at 695. Such grounds are "[m]ost often" located "in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Id*. In a footnote to the sentence explaining that "explicit legislative statements" must underlie a public-policy tort claim, the Court offered these four specific examples of statutes meeting that description: "MCL 37.2701 . . . (Elliott-Larsen Civil Rights Act [ELCRA]); MCL 37.1602 . . . (Handicappers' Civil Rights Act [HCRA]);[1] MCL 408.1065 . . . ([Michigan] Occupational Safety and Health Act [MiOSHA]); [and] MCL 15.362 . . . (The Whistleblowers' Protection Act [WPA])." All of these statutes contain anti-retaliation provisions. *Id*. n 2.

A decade after deciding *Suchodolski*, the Supreme Court muddied that case's contours and shrunk its applications, creating uncertainty about when a public-policy tort case is preempted by an anti-retaliation statute. In *Dudewicz*, 443 Mich 68, the Supreme Court eliminated one of the four "explicit legislative statements" it had identified in *Suchodolski* as giving life to a public-policy tort claim—the WPA. Not content to confine itself to axing the WPA from *Suchodolski*'s list, *Dudewicz* went even farther, narrowing the reach of all public-policy claims by announcing that "[a] public policy claim is sustainable . . . only where there also is *not* an applicable statutory prohibition against discharge in retaliation for the conduct at issue." *Id*. at 80 (emphasis added). While *Suchodolski* decreed that a statute *must* supply the source of a public policy to sustain a public-policy tort claim, *Dudewicz* erased every statute prohibiting discharge in retaliation for the conduct at issue. Not only did *Dudewicz* fail to acknowledge that its language contradicted *Suchodolski*; it ignored that a decade earlier, it had *included* the WPA in its list of public-policy pronouncements potentially giving rise to a public-policy claim. And its reasoning for nixing public-policy claims when there is "a statutory prohibition against discharge in retaliation for the conduct at issue" was thin at best.

The plaintiff in *Dudewicz* alleged that he was fired because he refused to drop criminal assault charges against a co-employee, contrary to an order issued by his employer. *Id*. 71. He sued under the WPA and additionally pleaded a public-policy tort claim. The Supreme Court held

---

[1] This act has since been renamed the Persons With Disabilities Civil Rights Act.

that the employee's report of a co-employee's violation of the law coincided with "traditional notions of whistleblowing," *id*. at 75, despite that "[n]othing in the plaintiff's complaint alleged that the defendant-employer violated any law or that the plaintiff was fired for reporting the defendant's violation of law to a higher authority." *Id*. at 76. The Supreme Court rejected the plaintiff's public-policy tort claim, however, holding that it was "preëmpted by the application of the WPA." *Id*. at 78.

Why was the claim preempted by the WPA in 1993 despite that in 1982, the Court specifically identified the WPA as a source of a public-policy tort claim? The Court dodged that obvious question by limiting its preemption analysis to the statement that "[a]s a general rule, the remedies provided by statute for violation of a right having no common-law counterpart are exclusive, not cumulative." *Id*.

The Court's conclusion that the WPA is an "exclusive" remedy that automatically trumps a public-policy tort claim is problematic. The Legislature never designated the WPA as an exclusive or preemptive remedy. The Court's "general rule" of preemption does not withstand scrutiny, either.

As support for its "general rule" of preemption the *Dudewicz* Court cited *Pompey v Gen Motors Corp*, 385 Mich 537; 189 NW2d 243 (1971). In *Pompey*, the Court stated that "where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive." *Id*. at 552. But the *Pompey* Court hedged with the qualifier that "[i]n the absence of a pre-existent common-law remedy, the statutory remedy is not deemed exclusive if such remedy is plainly inadequate[.]" *Id*. at 553 n 14. A leading treatise further clarifies the *Pompey/Dudewicz* "general rule," explaining, "Courts presume a statute is consistent with the common law, and so a statute creating a new remedy or method to enforce a right which existed before is regarded as cumulative rather than exclusive of previous remedies." 2B Singer, Sutherland Statutes & Statutory Construction (7th ed), § 50:5, p 178. Only where a statute creates "a new right" and "provides the remedy to enforce that right" is the new remedy "not cumulative with other common law remedies." *Id*. at 178-179.

The remedy section of the WPA does not declare or even hint at its own exclusivity.[2] That said, the WPA was indeed groundbreaking legislation. Michigan was "the first state to enact a

---

[2] The remedy section of the act provides:

> (1) A person who alleges a violation of this act may bring a civil action for appropriate injunctive relief, or actual damages, or both within 90 days after the occurrence of the alleged violation of this act.

> (2) An action commenced pursuant to subsection (1) may be brought in the circuit court for the county where the alleged violation occurred, the county where the complainant resides, or the county where the person against whom the civil complaint is filed resides or has his or her principal place of business.

statute affording protection to whistleblowers from discriminatory treatment by employers." Young, *The Whistleblowers' Protection Act: A Look at the Statute and Proposed Modification*, 46 Wayne L Rev 1691, 1691 (2000). The act "is unique in that it prohibits employers from firing or discriminating against any employee because he 'reports or is about to report' illegal conduct in the workplace." *Id*. But common-law rights protecting employees from retaliatory discharge and common-law remedies in the form of tort actions preexisted the WPA's 1981 enactment. *Id*. at 1693. See also *Trombetta v Detroit, Toledo & Ironton R Co*, 81 Mich App 489; 265 NW2d 385 (1978); *Sventko v Kroger Co*, 69 Mich App 644; 245 NW2d 151 (1976). The WPA expanded the rights and remedies recognized in those cases. Contrary to *Dudewicz*, the rights and remedies the WPA codified *did* have "common-law counterparts" and common-law roots.

Because our courts have long recognized a common-law claim for whistleblowing, *Dudewicz*'s apparent abrogation of common-law remedies for whistleblowing in favor of purely statutory ones also contradicts our state's constitution: "The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." Const 1963, art 3, § 7. The Supreme Court has repeatedly reiterated this principle. See, e.g., *Velez v Tuma*, 492 Mich 1, 11-12; 821 NW2d 432 (2012) (explaining that "[t]he common law remains in force until 'changed, amended or repealed"). Courts must "not lightly presume that the Legislature has abrogated the common law. Nor will we extend a statute by implication to abrogate established rules of common law." *Id*. Indeed, the Supreme Court declared in *Velez*, 492 Mich at 11-12: "Rather, the Legislature should speak in no uncertain terms when it exercises its authority to modify the common law." (Quotation marks and citations omitted).

Common-law preservation existed in 1993, when the Supreme Court decided *Dudewicz*. See, e.g., *Rusinek v Schultz, Snyder & Steele Lumber Co*, 411 Mich 502, 508; 309 NW2d 163 (1981) ("[T]he no-fault act must be construed as retaining the common-law action for loss of consortium. The common-law action for loss of consortium in Michigan is not expressly abolished by the language of § 3135. If this section abolishes this common-law right it must be found to do so by implication. There is nothing, however, in the language of the act or its legislative purposes that requires such a construction.").[3] The *Dudewicz* Court simply ignored this principle. And the

---

(3) As used in subsection (1), "damages" means damages for injury or loss caused by each violation of this act, including reasonable attorney fees.

(4) An employee shall show by clear and convincing evidence that he or she or a person acting on his or her behalf was about to report, verbally or in writing, a violation or a suspected violation of a law of this state, a political subdivision of this state, or the United States to a public body. [MCL 15.363.]

[3] More recently, in *Murphy v Inman*, 509 Mich 132, 157-158; __ NW2d __ (2022), the Supreme Court reiterated that common-law causes of action are not implicitly abrogated by enactments creating similar remedies. One of the questions presented in that case was whether the enactment of the Business Corporation Act, MCL 450.1101 *et seq*., "superseded and replaced the common law such that no common-law fiduciary duties exist independently of [MCL 450.1541a(1)]."

majority in this case entirely ignores the *Pompey* qualifier requiring that a public-policy tort analysis include an evaluation of whether the allegedly preemptive statutory remedy is adequate.[4]

The majority and the Supreme Court have determined that Stegall does *not* have a viable claim under the WPA. Given that Stegall cannot establish a WPA claim, I am at a loss to understand why, logically, his public-policy claim should be preempted. *Rivera v SVRC Indus, Inc*, 507 Mich 962, 963; 959 NW2d 704 (2021) ("Because plaintiff has not demonstrated a question of fact that this conduct entitles her to recover under the WPA, her public-policy claim based on this conduct is not preempted by the WPA."). See also *Anzaldua v Neogen Corp*, 292 Mich App 626, 631; 808 NW2d 804 (2011) ("[I]f the WPA does not apply, it provides no remedy and there is no preemption."). The majority's application of *Dudewicz* overlooks that Stegall has no WPA against FCA, the only remaining defendant.

Aside from the WPA, Stegall has invoked OSHA and MiOSHA as support for his public-policy claim. The majority holds that these statutes, too, are preempted according to *Dudewicz*. But there is another way to look at *Dudewicz* that preserves Stegall's public-policy tort claim.

In his concurring opinion in *McNeil v Charlevoix Co*, 484 Mich 69, 90 n 5; 772 NW2d 18 (2009), Justice Michael Cavanagh expressed that "the context of the [*Dudewicz*] opinion shows that the Court intended to limit the public-policy exception only in instances in which a legislative enactment both provides an anti-retaliation provision *and also creates an exclusive remedy*." (Emphasis added). Justice Cavanagh would interpret *Dudewicz* to mean that "where the WPA applies, the public-policy exception to the common-law at-will employment doctrine is preempted because the party was afforded relief by the WPA's exclusive statutory remedy."[5] *Id*. Even so,

---

*Murphy*, 509 Mich at 145-146. The Court held that it did not, echoing *Velez v Tuma*, 492 Mich 1, 11; 821 NW2d 432 (2012):

> [T]he mere existence of a statute does not necessarily mean that the Legislature has exercised this authority. We presume that the Legislature knows of the existence of the common law when it acts. Therefore, we have stated that we will not lightly presume that the Legislature has abrogated the common law and that the Legislature should speak in no uncertain terms when it exercises its authority to modify the common law. [*Murphy*, 509 Mich at 153. (cleaned up).]

This is the proper framework for evaluating whether a common-law cause of action has been preempted by a subsequent statutory enactment.

[4] The statutory remedy for whistleblowing is not adequate for those who lose their jobs because they have blown the whistle only internally, because they are foreclosed from bringing a claim. See *Manzo v Petrella*, 261 Mich App 705; 683 NW2d 699 (2004).

[5] Respectfully, I disagree with Justice Cavanagh's view that the WPA is an "exclusive statutory remedy." The Legislature never designated it as such, and the words of the statute do not indicate that the Legislature intended to displace any existing common-law remedies for retaliatory discharge.

Justice Cavanagh continued, "This reasoning does not suggest that a non-retaliation provision in a legislative enactment would, standing alone, preempt a public-policy claim if the legislative enactment either did not provide a remedy or if the remedy provided was not exclusive." *Id*.

Justice Cavanagh's interpretation of *Dudewicz* makes sense and is true to a fair reading of *Suchodolski*. But the majority and other panels of this Court have interpreted *Dudewicz* as barring public-policy tort claims whenever a relevant statute prohibits retaliation, regardless of whether the statute provides an adequate remedy.[6] Not only does the majority decide that Stegall's WPA claim is preempted; the majority holds that because "MiOSHA and OSHA both prohibit retaliatory discharge," they, too, preempt Stegall's public-policy tort claim.

The majority's holding squares with an interpretation of *Dudewicz* focusing only on whether a statute prohibits retaliation, but places no weight on the exclusivity or the sufficiency of the statutory remedy. As Justice Cavanagh pointed out, there is language in *Dudewicz* suggesting that its holding is not as broad as the majority proposes: "A public policy claim is sustainable . . . only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue. As a result, *because the WPA provides relief to Dudewicz for reporting his fellow employee's illegal activity*, his public policy claim is not sustainable." *Dudewicz*, 443 Mich at 80 (emphasis added). If the italicized language is relevant post-*Dudewicz*, the majority's preemption holding is surely wrong.

Although the federal OSHA prohibits retaliatory discharges of employees who report workplace safety violations, OSHA does not authorize private causes of action to redress retaliation. *Taylor v Brighton* Corp, 616 F 2d 256, 264 (CA 6, 1980). Suit must be brought by the Secretary of Labor. And the same is true under MiOSHA; the director of labor must bring the claim. MCL 408.1065. Neither statute claims to set forth an exclusive remedy, and neither affords a plaintiff like Stegall complete relief for a retaliatory termination. Because Stegall lacks an adequate remedy under these statutes, the majority incorrectly jettisons his public-policy tort claim.

As the majority would have it, the *Suchodolski* list of possible public-policy statements giving rise to a public-policy tort claim for retaliatory discharge is now reduced to two: the ELCRA, MCL 37.2701, and the Persons With Disabilities Civil Rights Act (PWDCRA), MCL 37.1602. No caselaw addresses whether a public-policy tort claim premised on retaliation is preempted by these remaining statutes, but the majority's interpretation of *Dudewicz* compels the conclusion that it would be; both statutes contain anti-retaliation provisions. See MCL 37.2701(a) and MCL 37.1602(a). What then is left of *Suchodolski* and the public-policy tort cause of action? My research reveals only one published case in which a public-policy tort claim survived: *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519; 854 NW2d 152 (2014). There, the claim hinged

---

[6] For further evidence that Justice Cavanagh's view has not been adopted, see *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569, 573; 753 NW2d 265 (2008), citing *Dudewicz*, 443 Mich at 78-80, lv den 482 Mich 989 (2008) ("[W]here there exists a statute explicitly proscribing a particular adverse employment action, that statute is the exclusive remedy, and no other 'public policy' claim for wrongful discharge can be maintained.").

on MCL 333.20176a, in which "the Legislature clearly expressed a desire to further [public] policy by prohibiting retaliation against an employee who reports malpractice." *Landin*, 305 Mich App at 530. *Landin* survives *Dudewicz* because MCL 333.20176a, which prohibits retaliation for reporting malpractice, does not create any cause of action for an employee.

In answer to the question that the Supreme Court did not ask, *Suchodolski* hangs on only by a thread. The Supreme Court mortally wounded it in *Dudewicz* by reading exclusivity and preemption into the remedial civil rights statutes passed by our Legislature between 1976 and 1981.

Why should the Supreme Court breathe new life into *Suchodolski*? By providing a private cause of action, tort law permits the full compensation of injured people. Absent an expressed legislative intent to occupy a field, tort claims do not conflict with or frustrate agency efforts to enforce safety or civil rights statutes. Agencies such as OSHA and MiOSHA often lack the resources to pursue individual claims, thereby permitting safety violations and retaliation for reporting them to remain unchallenged and unredressed.

*Wyeth v Levine*, 555 US 555; 129 S Ct 1187; 173 L Ed 2d 51 (2009), is instructive. That case involved whether the federal Food, Drug, and Cosmetic Act (FDCA) preempted a state-law tort claim against a drug manufacturer. The United States Supreme Court held that it did not, in part because Congress did not explicitly preempt state-law tort actions: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." *Id*. at 574. The *Wyeth* majority also took pains to elucidate the function of tort law in the drug regulation context; the Court's reasoning is just as applicable to private causes of action revealing workplace safety violations:

> In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the [Food and Drug Administration (FDA)] traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation. [*Id*. at 578-579.]

This case reveals yet another reason for reconsidering *Dudewicz*. The WPA prohibits retaliation against employees who report or are "about to report . . . a violation or a suspected violation of a law or regulation . . . to a public body[.]" MCL 15.362. Here, Stegall repeatedly complained *internally* to his FCA supervisors about possible asbestos exposure. A reasonable jury could conclude that these *internal* complaints triggered the decision to terminate his employment, even absent Stegall's later threat to "go to OSHA." The WPA provides Stegall with no pathway to present this claim, see *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d

210 (1998), and yet according to the majority, it preempts it. By forbidding public-policy claims when a statute "prohibits discharge in retaliation for the conduct at issue," *Dudewicz* sweeps too broadly, foreclosing potentially meritorious actions such as this one and leaving Stegall without a remedy despite that a jury could find that suffered a retaliatory discharge in response to good-faith reports of a safety violation.

## II. FCA'S PREEMPTION ARGUMENT WAS NOT PRESERVED

In general, to be preserved for appeal an issue must have been raised in or decided by the trial court. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020). FCA first argued that Stegall's public-policy tort claims were preempted by OSHA, 29 USC 651 *et seq*., and MiOSHA, MCL 408.1001 *et seq*., in the Supreme Court. *Stegall II*, 976 NW2d at 668 n 1. Whether Stegall's public-policy claim is preempted by OSHA or MiOSHA was not raised or decided by the circuit court.

Given this glaring lack of preservation, this Court's review of the preemption issue is inappropriate. Our Supreme Court has explained:

> Michigan generally follows the "raise or waive" rule of appellate review. Under our jurisprudence, a litigant must preserve an issue for appellate review by raising it in the trial court. Although this Court has inherent power to review an issue not raised in the trial court to prevent a miscarriage of justice, generally a failure to timely raise an issue waives review of that issue on appeal. [*Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) (quotation marks and citations omitted).]

It is particularly unfair to permit FCA to achieve an affirmed summary disposition judgment based on an argument not included in its summary-disposition motions, and which did not form any part of the circuit court's summary disposition decision. Indeed, the issue was not even raised on appeal in this Court. Although Stegall was allowed to address the issue in the Supreme Court, the lack of preservation warrants a conclusion that the unpreserved issue of preemption under OSHA and MiOSHA should not be considered. Were it not for the importance of the preemption question, I would stop there.

## III. STEGALL'S PRIMA FACIE PUBLIC-POLICY TORT CASE

Stegall worked as an information and communication technology support specialist at defendant FCA's Sterling Heights Assembly Plant (SHAP). A staffing agency, defendant Resource Technology Corporation doing business as Brightwing, assigned Stegall to work at defendant FCA US, LLC. Two months after he reported possible asbestos contamination in his workplace and requested air quality testing and safety gear, FCA notified Brightwing that it planned to terminate Stegall's employment. I described the relevant facts in my dissenting opinion in *Stegall v Resource Technology Corp*, unpublished per curiam opinion of the Court of Appeals, issued September 24, 2019 (Docket No. 341197) (*Stegall I*), and repeat them here.

> In April 2016, Stegall became concerned about possible exposure to asbestos dust when he and two colleagues were assigned to work in "the penthouse" of FCA's SHAP. During a meeting with two supervisors, Stegall complained that

he and his two coworkers developed respiratory symptoms (coughing with bloody mucous and itchy, watery eyes) after working in the penthouse. On April 28, 2016, Stegall sent the following email to his immediate supervisor, Jim Scarpace, Scarpace's supervisor, Richard Spondike, first-shift IT supervisor Mitul Patel, and a coworker:

> These are just three (3) IDF examples of what we have to contend with during the cleaning. This doesn't even include the paths or walkthroughs areas (air exchange, heating and ventilations areas) on getting to the IDFs, which have the same issues. Mind you, the pictures attached are not the worst offenders, but the ones we could immediately take shots of.
>
> A lot of the pipes are damaged, material falling out above head, and dust/material around these areas.
>
> *We would like to be provided with the necessary personal protective equipment on handling these areas where asbestos pipes are exposed and damage [sic]. And some type of guarantee these items will protect our health.*
>
> These issues were brought up in the past[] because of sickness that has occurred amongst a few ICT workers cleaning IDFs within the upper TCF substations. *We want to make sure our long term health isn't being affected by the dust/particles within these areas.*
>
> FYI: The picture of my shoes is from a 10-15 minute walk within these areas. It's that bad. [Emphasis added.]

Stegall attached photographs depicting overhead pipes and insulation. Some of the pipes display a "DANGER" warning stating, "CONTAINS ASBESTOS FIBERS AVOID CREATING DUST CANCER AND LUNG DISEASE HAZARD." Based on the readily visible warning combined with his respiratory symptoms and the dust collecting on his shoes, Stegall reached the logical conclusion that the penthouse might be contaminated with airborne asbestos.

Spondike forwarded Stegall's photos (without the accompanying text) to an employee health and safety manager, who in turn forwarded them to an outside consultant, John Pomroy. Based only on the photos, Pomroy opined that there was nothing to worry about; although there were asbestos-wrapped pipes in the penthouse, he explained, it appeared that only fiberglass-wrapped pipes were damaged. This information was not shared with Stegall. Instead, Spondike provided Stegall and his coworkers with respiratory masks to use when they worked in the penthouse. Stegall was informed that FCA would obtain air quality testing to verify the safety of that area.

After receiving the protective gear and the reassurance that testing had been ordered, Stegall went on vacation. When he returned on May 16, the masks were gone. Stegall asked for replacements, but none were provided. He was given no

explanation for this. Shortly after Stegall's renewed request for reassurance about possible asbestos exposure, Spondike had decided to terminate Stegall's FCA employment effective June 17. FCA had decided to temporarily shut down production at the Sterling Heights site beginning in June. However, in February, Spondike had informed a representative of ZeroChaos, a staffing agency, that he wanted to retain Stegall; Spondike was aware of the impending shut down at the time of their conversation.[3] Before his termination, Stegall had been advised by Spondike that if employment needs changed at SHAP, he would be transferred to a different plant. Stegall was never given any reason for his termination, and no documentary evidence of record explains why FCA released him from employment. Stegall was the only employee in his department whose employment ended. And Spondike admitted that FCA hired someone to replace Stegall.

During the week of June 13, Stegall asked Scarpace about the status of the air quality testing. Scarpace indicated that he had not yet seen it. In response to Stegall's persistent follow-up questioning, Scarpace stated that he did not know when the testing results would be available. At some time during that week, Stegall threatened to "go to OSHA." Stegall was officially released from employment with FCA on June 17. Stegall filed a discrimination complaint with MiOSHA and against Brightwing on July 6. Brightwing terminated him on August 3.

---

[3] ZeroChaos offers "workforce solutions" to FCA, managing the process of hiring "supplemental" employees. Stegall was employed by an agency called Brightwing, which supplied his résumé to ZeroChaos. ZeroChaos helped place Stegall at FCA. [Stegall I, unpub op at 3-5 (GLEICHER, J., dissenting).]

---

To establish a prima facie case of unlawful retaliation, a plaintiff must show (1) that he engaged in a protected activity, (2) that this was known by defendant, (3) that defendant took an employment action adverse to plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. [*Landin*, 305 Mich App at 533.]

When a plaintiff establishes a prima facie case, a rebuttable presumption of retaliation arises. *Debano-Griffin*, 493 Mich 167, 176; 828 NW2d 634 (2013). The employer must then offer a legitimate, non-retaliatory reason for the discharge. *Id*. A plaintiff's claim should be submitted to a jury if there is a material question whether the employer's proffered reason was a pretext for unlawful retaliation. *Id*.

As I stated my dissenting opinion in *Stegall I*, federal OSHA regulations express a public policy "protective of workers who complain or communicate concern about the possible presence of asbestos in a workplace. They envision that an employer will not retaliate when a worker seeks information or reassurance that a workplace is free from dangerous asbestos fibers. Whether a dangerous concentration of asbestos exists is irrelevant." *Stegall I*, unpub op at 6-7 (GLEICHER, J., dissenting).

I explained why I believe that Stegall set forth a prima facie case under a public-policy tort theory as follow:

His conduct was consistent with having exercised his right to an asbestos-free environment. Encouraging workers to report potential occupational health hazards without fear of discharge furthers the public policy of protecting lives and health, regardless of [whether] a dangerous level of asbestos actually is found. [*Id*. at 7.]

Given the public policies reflected in MiOSHA, OSHA, and their regulations, Stegall engaged in a protected activity when he complained and communicated concerns about possible exposure to asbestos in his workplace. That it was ultimately determined that there was no asbestos danger at the workplace does not alter the fact that he had a right to raise these concerns. Indeed, the Supreme Court majority stated: "In this case, plaintiff had a good-faith belief that there was a violation of asbestos regulations at his workplace and followed proper internal reporting procedures. His internal report was thus sufficient to state a public-policy claim." *Stegall II*, 976 NW2d at 668. FCA knew of Stegall's protected activity, given that he raised the concerns to FCA.[7] There was unquestionably an adverse employment action, given that Stegall was discharged.

The only element of a prima facie case at issue here is causation. As I explained in connection with the analogous WPA claim, temporal proximity alone can indicate causation in some cases. See *Stegall I*, unpub op at 7-8 (GLEICHER, J., dissenting). Temporal proximity and additional circumstantial evidence support a reasonable inference of causation for the purpose of Stegall's public-policy claim, as reflected in the following chronology:

After receiving the protective gear and the reassurance that testing had been ordered, Stegall went on vacation. When he returned on May 16, the masks were gone. Stegall asked for replacements, but none were provided. He was given no explanation for this. Shortly after Stegall's renewed request for reassurance about possible asbestos exposure, Spondike had decided to terminate Stegall's FCA employment effective June 17. FCA had decided to temporarily shut down production at the Sterling Heights site beginning in June. However, in February, Spondike had informed a representative of ZeroChaos, a staffing agency, that he wanted to retain [plaintiff]; Spondike was aware of the impending shut down at the time of their conversation.[8] Before his termination, Stegall had been advised by Spondike that if employment needs changed at SHAP, he would be transferred to a different plant. Stegall was never given any reason for his termination, and no documentary evidence of record explains why FCA released him from

---

[7] As for Brightwing, Stegall alleges that he was employed jointly by Brightwing and FCA. See *Stegall I*, unpub op at 3 (GLEICHER, J., dissenting) (noting that plaintiff "worked for both FCA and Brightwing, a staffing agency that provided [plaintiff] to FCA in 2013"). Moreover, Stegall later informed Brightwing directly of the asbestos issue, before Brightwing ended its employment relationship with him.

[8] I noted that "ZeroChaos offers 'workforce solutions' to FCA, managing the process of hiring 'supplemental' employees. Stegall was employed by an agency called Brightwing, which supplied his résumé to ZeroChaos. ZeroChaos helped place Stegall at FCA." *Id*. at 4 n 3.

-11-

employment. Stegall was the only employee in his department whose employment ended. And Spondike admitted that FCA hired someone to replace Stegall.

> During the week of June 13, Stegall asked [his immediate supervisor, Jim] Scarpace[,] about the status of the air quality testing. Scarpace indicated that he had not yet seen it. In response to [plaintiff's] persistent follow-up questioning, Scarpace stated that he did not know when the testing results would be available. At some time during that week, Stegall threatened to "go to OSHA." Stegall was officially released from employment with FCA on June 17. Stegall filed a discrimination complaint with MiOSHA and against Brightwing on July 6. Brightwing terminated him on August 3. [*Id*. at 4-5.]

I also noted that Stegall had an "entirely favorable" employment record with Brightwing and FCA, including "a letter of recommendation from a supervisor at FCA highly praising [plaintiff's] work and abilities . . . ." *Id*. at 8. Considering these strands of evidence together and viewing them in the light most favorable to Stegall, a genuine issue of material fact exists with respect to causation.

Thus, Stegall presented evidence establishing a genuine issue of material fact on all the elements of his prima facie claim. The Supreme Court did not directly instruct this Court on remand to consider whether Stegall presented a genuine issue of material fact related to whether FCA's purported nonretaliatory reason for discharging Stegall was pretextual. See *Stegall II*, 976 NW2d at 668 (directing this Court on remand to consider, *among other things*, "whether plaintiff has established a prima facie claim that he was discharged in violation of public policy," but not directing this Court to address the issue of pretext). Assuming that the Supreme Court's order implicitly directed us to consider pretext, I would hold that a genuine issue of material fact has been established. The purported nonretaliatory reason for discharging Stegall was that "FCA closed the entire plant when it eliminated the second shift." *Stegall II*, 976 NW2d at 671 (ZAHRA, J., dissenting). But as I noted before, before Stegall made his internal complaints about the asbestos issue, Spondike had conveyed that he wanted to retain Stegall, even though Spondike was at that point already aware of the impending shutdown. *Stegall I*, unpub op at 4 (GLEICHER, J., dissenting). Stegall was not given a reason for his termination, he was the only employee in his department to be let go, and Spondike admitted that FCA ultimately hired a replacement for him. *Id*. at 4-5. Viewing the evidence and reasonable inferences from it in the light most favorable to Stegall, a genuine issue of material fact exists regarding pretext. Accordingly, I would hold that he established a prima facie public-policy tort claim. But for *Dudewicz*, that claim should go to a jury.

/s/ Elizabeth L. Gleicher

-12-